## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**MICHELLE BOURDELAIS,**
*(formerly Michelle Durniak)*,
On her own behalf and behalf of all others similarly situated,

        **Plaintiff,**

**v.**                                                    **CIVIL NO. 3:10-cv-00670-HEH**

**J.P. MORGAN CHASE BANK, NA,**

**and**

**CHASE HOME FINANCE, LLC,**

        **Defendants.**

### AMENDED CLASS COMPLAINT

COMES NOW the Plaintiff, **MICHELLE BOURDELAIS,** *(formerly Michelle Durniak)*, by counsel, on her own behalf and behalf of all others similarly situated and for her complaint against the Defendants, she alleges as follows:

### PRELIMINARY STATEMENT

1.      This is an action for actual, statutory and punitive damages, costs and attorney's fees brought pursuant to the Federal Fair Credit Reporting Act (FCRA) 15 U.S.C. §1681 <u>et</u> <u>seq</u>., (an individual accuracy claim and a class claim for failure to send a proper denial letter) the Federal Equal Credit Opportunity Act (ECOA), 15 U.S.C. §1681, <u>et</u> <u>seq</u>. (alleged on a class basis for failure to send a lawful denial letter) and the Real Estate and Settlement Procedures Act (RESPA) as well as for state claims of Breach of Contract (alleged on a class basis) (and in the alternative Promissory Estoppel), Fraud and Defamation.

2.      Defendants J.P. Morgan Chase Bank, NA and Chase Home Finance, LLC (collectively "Chase") operate as a single mortgage lender and servicer.

3.      At its simplest, the individual Fair Credit claim in this case alleges that Chase inaccurately reported the Plaintiff as having defaulted on her mortgage and otherwise having violated her obligations to her creditor.  There is no objective basis for Chase to have reported this to the credit bureaus.  For all of her financial struggles over the last year of her relationship with Chase, Ms. Bourdelais has paid her mortgage and honored her obligations in the manner that Chase had insisted.

4.      When Plaintiff learned that Chase had inaccurately reported her as in default, and that such inaccuracies had destroyed her credit, she began a dispute process, both directly to Chase as well as through the national credit bureaus.  Chase then refused to investigate or correct its defamatory reporting.  In doing so, it violated both the FCRA and the RESPA.

5.      Michelle Bourdelais also brings this suit on behalf of herself and a class of similarly situated Virginia residents to challenge the failure of Defendant J.P. Morgan Chase Bank, NA to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP"). Plaintiff's allegation is simple – when a mortgage lender promises (in writing even) to modify an eligible loan to prevent impending default, homeowners who live up to their end of the bargain have a right to expect that promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure and to which it agreed when receiving a huge taxpayer funded bailout.

6.      In 2008, Chase accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. On July 31, 2009 Michael R. Zarro Jr., Sr. Vice President of J.P. Morgan Chase Bank, NA signed a contract with the U.S. Treasury (attached as Exhibit 1 and included by reference)

2

agreeing to participate in HAMP -- a program in which Chase received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers.

7.      As a participating servicer in HAMP, Chase has, in turn and through Chase Home Finance, LLC, entered into written agreements with consumers for temporary trial modifications. Consumers like the Plaintiff have complied with these agreements by submitting the required documentation and making payments. Despite such efforts, Defendant Chase has ignored its contractual obligations to modify their loans permanently.

8.      Importantly, it is this "Consumer to Chase, Chase to Consumer" direct contract that the Plaintiff seeks to enforce rather than the "Chase to U.S. Government, U.S. Government to Chase" agreement.  The former is a simple common law contract to which the consumer is a party, while in the latter, , she is only a third party.

## JURISDICTION

9.  This Court has federal question jurisdiction under the FCRA, 15 U.S.C. §1681p, the ECOA, 15 U.S.C. §1691e and RESPA, 12 U.S.C. § 2605(f), 28 U.S.C. §1331.

10. This court also has jurisdiction over the state law claims by supplemental jurisdiction 28 U.S.C. §1367, and by diversity, 28 U.S.C. §1332.   The parties – the Plaintiff with the putative class versus the Defendant – are residents of different states.

11.      Further, this putative class action is properly brought before this court pursuant to 28 U.S.C. § 1332(d) in that the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and all members of the class – alleged to be over 100 Virginia consumers - are citizens of a State different from the defendant.

12. Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the

unlawful practices are alleged to have been committed in this District and Division, Defendant

regularly conducts business in here, and the named Plaintiff resides here.

## PARTIES

13.  The Plaintiff is a natural person and resident of the State of Virginia.  Plaintiff is a

"consumer" and "person" protected by the FCRA, ECOA and RESPA.

14.  Defendant J.P. Morgan Chase Bank, NA is the entity that formally entered into the

TARP contract with the Department of Treasury in which Chase agreed collectively to accept and

process lawfully HAMP loan modification applications.

15.  Upon information and belief, Chase Home Finance, LLC**.,** is a foreign limited

liability company doing business as a mortgage originator and servicer and at all times relevant

hereto was a "furnisher" as governed by the FCRA and a "creditor" as governed by the ECOA.

16.  On information and belief, Plaintiff alleges that Chase Home Finance, LLC

operates as a wholly controlled agent of J.P. Morgan Chase Bank, NA.  Management is not

independent.   For all purposes of this action the two Defendants are one and the same.

17.  Upon information and belief, **EQUIFAX INFORMATION SERVICES, LLC.**

("***Equifax***") is a corporation authorized to do business in the State of Virginia through its

registered offices in Richmond, Virginia.

18.  Upon information and belief, ***Equifax*** is a "consumer reporting agency", as defined in 15

U.S.C. §1681(f).  Upon information and belief, ***Equifax*** is regularly engaged in the business of

assembling, evaluating, and disbursing information concerning consumers for the purpose of

furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.   Upon information

and belief, ***Equifax*** disburses such consumer reports to third parties under contract for monetary

compensation.

4

19.  Upon information and belief, **EXPERIAN INFORMATION SOLUTIONS, INC.** ("*Experian*") is a corporation authorized to do business in the State of Virginia through its registered agent office.

20.  Upon information and belief, *Experian* is a "consumer reporting agency", as defined in 15 U.S.C. §1681(f).  Upon information and belief, *Experian* is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.  Upon information and belief, *Experian* disburses such consumer reports to third parties under contract for monetary compensation.

21. Upon information and belief, **TRANS UNION, LLC**. ("*Trans Union*") is a corporation authorized to do business in the State of Virginia through its registered offices in Richmond, Virginia.

22.  Upon information and belief, *Trans Union* is a "consumer reporting agency", as defined in 15 U.S.C. §1681(f).  Upon information and belief, *Trans Union* is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

23.  Upon information and belief, *Trans Union* disburses such consumer reports to third parties under contract for monetary compensation.

### FACTUAL BACKGROUND
#### *The Foreclosure Crisis*

24.  Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in

5

foreclosure or default.[1]  Virginia reported 17,669 properties with foreclosure filings for the second quarter of 2010, the 11th highest activity level in the nation.  The latest total represents a 22 percent increase from the first quarter of the year and nearly 15 percent above the level reporting for the second quarter of 2009.[2]

25.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

### *Creation of the Home Affordable Modification*

26.     Motivated in significant part by such concerns, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 et. seq. (2009).

27.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. §5201.

28.   The Act established the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. In exercising its authority to administer TARP, the Act mandated that the Secretary of Treasury take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).   It further mandated that the Secretary "shall implement a

---

1 Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.

2 www.realtytrac.com/ContentManagement/Library.aspx?ChannelID=13&ItemID=9600

plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures" and to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." 12 U.S.C.A. §5219.

29.  On February 18, 2009, the Treasury Secretary and the Director of the Federal Housing Finance Agency created a uniform loan modification protocol now known as the Home Affordable Modification Program, or HAMP, the program that is at issue in this case.

30.  HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

31.  Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1000.00 for each HAMP modification.

### *Chase's Broken Promises Under HAMP*

32.  The mortgage industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. *Chase* is a servicer and its actions described herein were made as agents for the entities that hold mortgage loans.

33.  Should a servicer elect to participate in HAMP, they execute a Servicer Participation

Agreement ("SPA") with the federal government.[3] On July 31, 2009, Michael R. Zarro Jr., Sr. Vice President of J.P. Morgan Chase Bank, NA, executed an SPA, thereby making Chase a participating servicer in HAMP. (A copy of this SPA is attached hereto as Exhibit 1.)

34.   The SPA executed by Chase incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA 1.A.), and are incorporated by reference herein.

35.   The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." (SPA 1.A., 2.A.)[4]

36.   A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan.[5] The Trial Period Plan defines a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

---

3 Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

4 The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation—Frequently Asked Questions ("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5). These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiff.

5 The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

37.  Chase offers Trial Period Plans to eligible homeowners by way of a Trial Period Plan Agreement, which describes the homeowner's duties and obligations under the plan and contractually promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

38.  If the homeowner executes the Trial Period Plan Agreement, complies with objective documentation requirements and makes all three Trial Period Contract monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

39.  There is no lender or servicer discretion involved or permitted.  Once the servicer/lender contracts a Trial Period Plan, the consumer will be entitled to a permanent modification so long as they produce the defined set of documents required to verify the facts previously stated and also comply with the plan payment requirements during the Trial Period. Further, the terms of that permanent modification are also non-discretionary and are objectively determinable for each consumer based on the "waterfall" analysis required under the HAMP program.

40.  Chase has routinely failed to live up to its end of Trial Period Plan Agreements and to offer permanent modifications to homeowners. In January 2010, the U.S. Treasury reported that Chase had 424,965 HAMP-eligible loans in its portfolio. Of these loans, just 7,139 resulted in permanent modifications (approximately 1.7 %) even though many more homeowners had made the payments and submitted the documentation required by their Trial Period Plan Agreement. The Treasury Report is attached hereto as Exhibit  6.

41. By failing to live up to the Trial Period Plan Agreements and convert them into

9

permanent loan modifications, Chase is not only leaving homeowners in limbo and stressful

anxiety, wondering if their home can be saved, Chase is also preventing homeowners from

pursuing other avenues of resolution, including obtaining alternate lending or using the money

they are putting toward Trial Period Plan payments to fund bankruptcy plans, relocation costs,

short sales or other means of curing their default or reducing the harm from it.

*HAMP Credit Reporting Guidelines*

42.  In addition to various program procedures created to instruct Chase and other

servicers on creation and implementation of trial plans and permanent modifications, the

program created very specific requirements and a protocol to govern credit reporting for HAMP

consumers.

43.     The Fannie Mae Servicing Guide, Part VII, Section 107: "Notifying Credit

Repositories", which governed Chase in these regards, requires that a servicer continue to report

a "full-file" status report (describing the exact status of each mortgage loan it is servicing as of

the last business day of each month) to the four major credit repositories for each loan under the

HAMP and to do so in accordance with the Fair Credit Reporting Act and credit bureau

requirements established through the Consumer Data Industry Association (the "CDIA").

44.     The CDIA 2010 Mortgage & Home Equity Reporting Guidelines, attached hereto

as Exhibit 7, define the industry standard for "accuracy" and in relevant part state verbatim:

**Reporting Guidelines for Trial Period:**

The guidelines below should be followed when reporting payments during the trial
period:

10

1. *Current, but facing imminent default or Current, but eligible for loan modification*.

If the consumer was current with payments prior to the trial period, and they make each month's payment on time, report the consumer as current (Account Status 11) during the trial period. If the consumer is at least 30 days past due during the trial period, report the Account Status Code that reflects the appropriate level of delinquency.

Special Comment Code 'AC' (Paying under a partial or modified payment agreement) should also be reported.

Note: Effective November 2010, the verbiage for Special Comment Code 'AC' will be "Paying under a partial payment agreement".

2. *Delinquent*.

If the consumer was delinquent (at least 30 days past the due date) prior to the trial period and the reduced payments do not bring the account current, report the Account Status Code that reflects the appropriate level of delinquency.

Special Comment Code 'AC' (Paying under a partial or modified payment agreement) should also be reported.

Note: Effective November 2010, the verbiage for Special Comment Code 'AC' will be "Paying under a partial payment agreement".

45.     Summarized simply – the CDIA credit-reporting standards require that a consumer who is not yet in default when they enter into a Trial Period Plan Agreement is not to be reported as delinquent or in default thereafter.  "If the consumer was current with payments prior to the trial period, and they make each month's payment on time, report the consumer as current … during the trial period."

### *Facts Regarding the Plaintiff*

46.  Plaintiff and her husband purchased their home on Lake West Terrace in Glen Allen,

Virginia in December 2005.

47.   At the time of the purchase, the Plaintiff and her husband took out a $350,800.00 mortgage loan with Weichert Financial Services.

48.   In January 2006, the Plaintiff and her husband made a principal curtailment lump sum payment to Weichert Financial Services in the amount of $27,523.00.

49.   The servicing of the Plaintiff's mortgage was transferred sometime thereafter to **Chase.**

50.   The Plaintiff and her husband consistently paid their mortgage on time.

51.   On or about January 2009 the Plaintiff's contract employment ended and on or about February 2009, the Plaintiff's husband was laid off from his employment, all within a matter of 39 days.

52.   On or about March 13, 2009 Plaintiff and her husband forwarded a letter to **Chase** with the requested documentation including the Chase Borrowers Assistance Form signed on March 10, 2009, income verification documents and the required signed 4506-T Request for Tax Return form to be considered for the Home Affordable Mortgage Program (hereinafter referred to as "*Hamp*").

53.   On or about April 6, 2009 the Plaintiff and her husband forwarded a letter with additional documentation to their assigned workout analyst and again pleaded for a one time loan modification based on their hardship.

54.   The Plaintiff and her husband were – inaccurately - advised by the Chase employee that because they were current on their mortgage at the time, they would need to skip their mortgage payment for the month of May in order to qualify in order to be eligible for the requested *Hamp* program.  Chase inaccurately represented, as it regularly does, that the consumer must be in actual default rather than simply "at risk of imminent default."

55.     Plaintiff and her husband had never been late on any payments on any credit accounts or mortgages.

56.     On or about April 14, 2009 an Order was entered by the Henrico Circuit Court wherein the Plaintiff's name was changed from Michelle Lyn Bourdelais-Durniak to Michelle Lyn Bourdelais.

57.     On or about May 7, 2009 *Chase* forwarded a letter to the Plaintiff and her husband stating that it was extending a forbearance for a period of time.  The Plaintiff and her husband were required to pay a reduced payment of $1,346.18 for the months of June and July 2009 in order to remain current on their loan and avoid default.  The Plaintiff was under the impression that this was the first trial period (TTP) towards a full loan modification and paid all payments on time exactly as Chase had instructed.

58.     On or about June 22, 2009 the Plaintiff and her husband separated, however the Plaintiff continued to reside in the home with the parties two young children.

59.     On or about August 1, 2009 *Chase* forwarded to the Plaintiff a document entitled "Home Affordable Modification Trial Period Plan (Step One of Two Step Documentation Process)", which stated that the plan was effective on August 1, 2009 and would run from August 2009 to October 2009.  The Plaintiffs monthly mortgage payments were reduced to the amount of $1,535.57.  The Plaintiff and her husband signed the form along with another 4506-T Request for Transcript of Tax Form on August 10, 2009 and August 9, 2009, respectively, and forwarded all of the required documentation back to *Chase* prior to the August 14, 2009 deadline indicated on the correspondence.

60.     This Trial Period Plan Agreement was entitled "Home Affordable Modification

13

Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

61. The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following the month in which the last Trial Period Payment is due," and that "TIME IS OF THE ESSENCE."

62. Plaintiff timely made each of the payments provided for in the Trial Period Contract Agreement due in August, September and October 2009. She has also timely made payments for October, November and December 2009 and February 2010 through the present, consistent with her Trial Period Plan Agreement payment amount.

63. Unlike payments made pursuant to plaintiff's loan agreement with Chase, Chase did not apply these payments to reduce, even in part, the principal balance on plaintiff's loan, but rather placed said payments in an escrow account.

64. Plaintiff made numerous contacts with *Chase* during the months of August and September 2009 with regard to the status of her *HAMP* modification.

65. In September 2009, *Chase* represented to the Plaintiff that it was undergoing system changes that have inadvertently delayed completions of modifications. Plaintiff was further advised that until the system changes were finalized, the Plaintiff should continue to make the estimated

modification payment that was provided in the trial payment plan.

66.  On or about September 16, 2009 Plaintiff forwarded additional requested documents to *Chase.*

67.  By this period, the Plaintiff had learned that Chase was reporting to the credit bureaus that her loan was in default.  She then requested that *Chase* contact the bureaus to update the errors on her credit report.

68.  Out of nowhere, in late September 2009, Chase then sent to the Plaintiff a document titled "Acceleration Warning – Notice of Intent to Foreclose."  Chase asserted that the Plaintiff was in default because she had failed to pay the required installments and that the total amount past due on her loan was now $7,020.72.  This claim was false, as the Plaintiff had made all of her requested payments on time.

69.  In this same period and through this now significant set of events, the Plaintiff continued to contact and attempt communication with *Chase*, all of it to no avail.

70.  On or about October 5, 2009 the Plaintiff received an electronic mail from a Chase Representative stating in relevant as follows.

> "…While I appreciate your sense of urgency regarding the completion of your modification, I am not in a position to commit to having final modification documentation delivered within your requested time frame of November 1, 2009. As I explained previously, Chase is completing changes to the servicing systems in order to accommodate modification changes. Once Chase is positioned to service modified loans, we will move forward as quickly as possible. It is important to understand that there are no commitments made by the investor, or the lender, to have a modification completed within a particular timeframe. Modifications are completed as quickly as possible, and every effort will be made to ensure you receive the most prompt service as possible."

71.  On or about October 16, 2009 the Plaintiff received yet another letter from *Chase*

stating that her Modification was at risk. ***Chase*** advised that it was still missing documents that the Plaintiff had previously forwarded to ***Chase*** numerous times. The Plaintiff again provided the requested documentation.

72. On or about November 30, 2009 the Plaintiff received a letter from Chase that again her modification was at risk because it did not have a completed 4506-T Request for Copy of Tax Return. Again this document had been provided numerous times. The Plaintiff again provided the requested document.

73. On or about January 4, 2010 the Plaintiff received correspondence from the Chase Home Lending Executive Office in response to the Plaintiff's October 1, 2009 electronic correspondence. Chase responded that the implementation of the modification had not occurred because Chase still needed updated documents including further income information, copies of bank statements and another signed 4506-T Request for Copy of Tax Return. The Plaintiff again faxed all of the requested documents to Chase. She did so on January 7, 2010.

74. On or about January 8, 2010 the Plaintiff received another letter from Chase stating that Chase had not received all of the required documents to complete the request for modification and again requested a copy of her most recent bank statements. Plaintiff immediately re-faxed this information.

75. On or about January 16, 2010 the Plaintiff forwarded a letter to the Chase Executive Resolutions Department pleading for help in obtaining implementation of the permanent modification on her loan.

76. On or about January 31, 2010 the Plaintiff received a letter from the Chase Fulfillment Center that her modification was at risk and that her urgent response was needed. Chase represented

16

(again) that it had not received all of the required documents to complete the request for modification and needed (again) a signed 4506-T Request for Copy of Tax Return. The Plaintiff again provided the requested documents.

77. On or about February 16, 2010 Plaintiff received another "Acceleration Warning – Notice of Intent to Foreclose from Chase" letter.  The letter claimed that the Plaintiff was in default because she had failed to pay the required installments commencing with the payment due September 1, 2009 and that the total amount past due on the loan was now $13,653.58.  (Ironically, the letter also stated that the Plaintiff's loan "might be eligible for loan modification" and insisted, "Call us now!")

78. On or about April 7, 2010 a Quit Claim deed between the Plaintiff and her ex-husband was recorded transferring the property ownership solely to the Plaintiff.

79. On or about April 7, 2010 the Plaintiff received electronic correspondence from *Chase* that stated regarding Plaintiff's unemployment that *Chase* needed a copy of a document showing the amount and duration of her unemployment benefits, a court order and proof of payments for the consideration of child support income and the Quitclaim deed.  Chase represented that upon its receipt of the recorded Quit Claim Deed, it would be able to implement the permanent loan modification and that *Chase* would escalate the process once the information was received.

80. On or about May 24, 2010 Plaintiff forwarded to *Chase* via fax a copy of her Retirement Statement along with copies of her bank account numbers with pin numbers from Wachovia that had been requested by Chase.

81. On or about May 25, 2010 Plaintiff again forwarded via fax a copy of her Retirement

Statement along with copies of her bank account numbers with pin numbers from Wachovia that had been requested by *Chase*.

82.   On or about May 7, 2010 out of sheer exhaustion the Plaintiff retained attorney Brian Stevens to help her facilitate her continued contacts with *Chase* to obtain the modification on her loan.   On this date Attorney Stevens forwarded a letter via Federal Express delivery to *Chase* advising of his representation and provided additional copies of the loan modification paperwork that had previously been submitted numerous times by the Plaintiff.   In addition Attorney Stevens provided the recorded Quit Claim Deed and a copy of the Consent Order awarding the Plaintiff child support each month to be paid by her estranged husband.

83.   On or about May 11, 2010 Attorney Stevens forwarded another letter to *Chase* regarding the Plaintiff's unemployment determination and payment stubs provided as income verification from the Virginia Employment Commission.   He also sent along a copy of the *HAMP* regulations documenting that both child support and unemployment compensation be considered as valid income.

84.   On or about May 12, 2010 *Chase* confirmed to the Plaintiff that it had scanned her information into the documentation system.   However, it then demanded that the Plaintiff fill out again all of the same forms previously provided as well as provide yet another signed 4506-T Request for Copy of Tax Return.

85.   On or about May 12, 2010 the Plaintiff forwarded to *Chase* by certified mail copies of her bank statements.   And on May 13, 2010, she forwarded (again) all of the additional documents *Chase* had demanded.   The Plaintiff also pleaded that she has done everything *Chase* has asked her to do with regard to obtaining her loan modification since May 2009.

18

86. On or about May 14, 2010 Plaintiff received a phone call from *Chase* confirming receipt of the Plaintiff's fax however, the *Chase* employee now stated that it would need paper bank statements instead of online bank statements and requested that the Plaintiff refax the paper statements.  Plaintiff immediately did so.

87. On or about May 17, 2010 the Plaintiff faxed a letter to the CEO of Home Lending at *Chase*, pleading for it to provide the permanent loan modification as previously contracted in the Trial Period Plan Agreement.   It had by then been fourteen months since *Chase* became so obligated.

88. On or about May 17, 2010 the Plaintiff received a letter from *Chase* addressed to John R. Durniak and Michelle L. Durniak.  (in which *Chase* failed to have processed the change of name or the Quit Claim deed processes.)  *Chase* advised that the Plaintiff's mortgage account required "immediate attention" as follows:

> Thank you for participating in the Chase Home Affordable Modification Program – we are writing to inform you that we have not received all documents necessary to complete your request for modification.  We cannot continue your request for a Chase Home Affordable Mortgage Program because the documents we need are:
>
> > A Request for Modification and Affidavit
> > A completed 4506-T-EZ Short form Request for Individual Tax Return Transcript
> > A completed 4506-T Request for Transcript of Tax Return

89. On or about May 17, 2009 and May 19, 2009 Plaintiff faxed to *Chase* her bank account numbers, fully exposed 16 digits as *Chase* claimed it required, along with the Plaintiff's PIN numbers for each of the bank accounts.

90. On or about May 18, 2010, Attorney Stevens faxed to the *Chase* CEO Home Lending, Loss Mitigation Department and the Executive Resolution Department copies of the

19

Plaintiff's 2008 and 2009 signed tax returns, documentation on the Plaintiff's T. Rowe Price

Retirement Accounts, Plaintiff's bank account information provided and notarized by Wachovia

Bank, copies of the real estate comparables for the Net Present Value determination in the

*HAMP* process and a copy of the Plaintiff's FICO credit report.

91.  On or about May 18, 2010 the Plaintiff had a conference call with ***Chase*** and the

Plaintiff's estranged husband.  The ***Chase*** representative stated that she couldn't find the 2008

signed tax returns in the packet Plaintiff had sent and that this was all that was needed for

completion.   Plaintiff reconfirmed that the 2008 were in the packet and further advised that she

would Federal Express mail additional copies.  This package was received by ***Chase*** on May 20,

2010.

92.  On or about May 19, 2010, Attorney Stevens faxed a letter to ***Chase*** with regard to

the 2008 tax returns previously forwarded and provided additional copies of all of the previously

submitted documentation including the 2008 tax returns via Federal Express delivery.  This

package was confirmed received by ***Chase*** on May 20, 2010.

93.  On or about May 20, 2010 Plaintiff received a voice mail from ***Chase*** that all of the

Plaintiff's documentation was completed and under review.

94.  On or about May 22, 2010 Plaintiff received a letter from ***Chase*** Letter titled,

"Making Home Affordable Modification Trial Period Plan Offer – Notice of Expiration."  ***Chase***

advised that it was writing to notify that the trial period plan agreement had expired because:

> "[Y]ou did not provide us with the documents we requested.  A notice, which
> listed specific documents we needed and the time frame required to provide them,
> was sent to you previously."

95.   On or about June 17, 2010, ***Chase*** forwarded a copy of a letter addressed to the

20

Plaintiff to Senator Mark Warner's office purportedly responding to the Plaintiff's letter to Mark Warner dated May 17, 2010 regarding her issues with *Chase*.  The letter stated that the Plaintiff was ineligible for the *HAMP* program because of the Net Present Value Determination (NPV) made by *Chase*.[6]  Plaintiff has never personally received an original letter from *Chase* as addressed – a copy of this letter was sent solely to Mark Warner's office and Mark Warner's office subsequently faxed a copy of the letter to her.  This was the only written statement the Plaintiff has seen attempting to explain Chase's reason for denying her permanent modification.

96.  On or about July 2, 2010 *Chase* forwarded yet another "Acceleration Warning - Notice of Intent to Foreclose" letter claiming that the Plaintiff is in default because she has failed to pay the required payments since January 1, 2010 and that she was now $15,407.08 in arrears in the payment of her mortgage.

97.  On or about July 7, 2010, Attorney Brian Stevens forwarded a letter via express delivery to *Chase* requesting the NPV calculations referenced in the *Chase* letter to Senator Warner.  This correspondence was received by *Chase* on July 12, 2010, however, *Chase* has never responded to this request.

98.  After this process, *Chase*'s scheme became apparent.  It was trying to use the Trial Period to do additional credit, income and NPV verifications that servicers are actually supposed to complete *before* contracting a Trial Period Plan.

99.  The only obligations on a consumer such as the Plaintiff after the Trial Period Plan Agreement is contracted as stated in the HAMP Servicer checklist: "For Modification Agreement

---

6  The "Net Present Value Determination" is one of the eligibility factors a servicer is to determine before agreeing to contract a Trial Period Plan.  Essentially, it tries to determine if the lender would be better off if the mortgage loan

to be executed— Borrowers must successfully complete trial period and return two signed Home Affordable Modification Agreements to the servicer."  Home Affordable Modification Program (HAMP):  Checklist for Getting Started and Participating in HAMP, February 22, 2010, Exhibit 8.

100.    Thus, contrary to *Chase*'s misstatement in its letter to Senator Warner, the "NPV" determination was not a condition for conversion of the Trial Period Plan Agreement to a permanent modification.

101.   By this point, *Chase* had been reporting to the Credit Reporting Agencies that her mortgage account had been delinquent since July 2009 and that she had been 90+ days late on her mortgage since December 2009 and for each month thereafter.  *Chase* was further reporting that she had a past due balance on her mortgage of over $15,000.00.  (*the Chase Reporting*).

102.   The *Chase* Reporting was inaccurate.  The Plaintiff  has never been 90+ days late on her mortgage at any time, nor is she over $15,000.00 delinquent.

103.   Plaintiff has disputed the *Chase* mortgage account on multiple occasions through the national consumer reporting agencies and most recently in June 2010.

104.   On or about June 10,  2010, *Equifax's* Results of Investigation mailed to the Plaintiff advised that the *Chase* mortgage account had been verified by the creditor and that additional information had been provided for the account.  This additional information was the account was now reporting as a collection account and that it was 180 days or more past due since April 2010.

105.   On or about June 11, 2010, *Experian's* Investigation Results mailed to the Plaintiff advised that the *Chase* mortgage account had been updated.  The Chase account was likewise

---

was foreclosed as opposed to modified.

reporting that it was 180 days or more past due since April 2010, that the account was $15,445.00 past due and that the recent balance on the loan was now $699,098 as of June 2010.

106.   On or about June 12, 2010, *Trans Union's* Investigation Results mailed to the Plaintiff advised that it was reporting new information for the *Chase* mortgage account.  The *Chase* mortgage account had been verified as 120 days past due, with a past due balance of $15,445.

107.   On information and belief, the Plaintiff alleges that *Chase* received, but ignored the Plaintiff's disputes and did refuse to correct and delete the inaccurate information regarding the derogatory account from the Plaintiff's credit files.

108.   Throughout the entire trial period, *Chase* failed to report the Plaintiff's account accurately and in the manner prescribed by the CDIA guidelines.  Her loan was current when it entered the plan and was to be reported current after she entered the plan.

109.   *Chase* had actual knowledge of these inaccuracies and deliberately chose to cause the reporting of the derogatory accounts.

110.   After one or more of the Plaintiff's disputes were forwarded by the credit bureaus to Chase, *Equifax, Experian* and *Trans Union* prepared and published to third parties multiple inaccurate consumer reports about Plaintiff that contained and republished the inaccurate derogatory *Chase* mortgage tradeline.

111.   Upon information and belief, Plaintiff alleges that on one or more occasions *Equifax, Experian* and *Trans Union* forwarded Plaintiff's dispute to *Chase*.  Upon information and belief, *Chase* was provided notice of Plaintiff's dispute and despite this notice, failed and refused to investigate and correct it's inaccurate reporting.

## **COUNT ONE:  BREACH OF CONTRACT**

## CLASS CLAIM

112.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

113.     **The Contract Class**.  Pursuant to Rule 23 of the Federal Rules of Civil

Procedure, Plaintiff brings this action for herself and on behalf of a class (the "Class") initially

defined as follows:

>           All natural persons who on any date on or after July 31, 2009, (a.)
>           with regard to a mortgage loan secured by their personal residence
>           (b.) located in the Commonwealth of Virginia and otherwise eligible
>           for application of HAMP, (c.) entered into a written Trial Period Plan
>           Agreement with Chase, and thereafter (d.) made their three trial
>           payments as therein required.
>
>           Excluded from the class definition are borrowers to whom Chase sent,
>           prior to the effective date stated in their Trial Period Plan Agreement,
>           either:
>           (a) a permanent Home Affordable Modification Agreement, or
>           (b) a written denial of eligibility
>
>           Also excluded from the class definition are any employees, officers,
>           directors of Chase, any attorney appearing in this case, and any judge
>           assigned to hear this action.

114.     **Numerosity.  FED. R. CIV. P. 23(a)(1).**   Plaintiff does not know the exact size or

identities of the members of the proposed class, since such information is in the exclusive control

of Defendant. However, on information and belief, Plaintiff alleges that the class encompasses

many hundreds of individuals whose identities can be readily ascertained from Defendant's

books and records. Therefore, the proposed class is so numerous that joinder

of all members is impracticable.

115. Based on the size of the modifications at issue, Plaintiff believes the amount in

controversy exceeds $5 million. In the alternative, Plaintiff believes the amount in controversy exceeds $5 million based on the equity loss that could result to putative class members if they were to lose their homes to foreclosure as a result of Defendant's failure to convert temporary modifications into permanent modifications.

116.   **Existence and Predominance of Common Questions of Law and Fact.  FED. R. CIV. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual members.  All members of the class have been subject to and affected by the same conduct. These common legal and factual questions include, among other things and without limitation:

> a.     The claims are based on form contracts and uniform loan modification processing requirements;
>
> b.     The nature, scope and operation of Defendant's obligations to homeowners under *HAMP*;
>
> c.     Whether Defendant's receipt of an executed Trial Period Plan Agreement, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Defendant to offer class members a permanent *HAMP* modification;
>
> d.     Whether Defendant's failure to provide permanent *HAMP* modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing; and
>
> e.     Whether the Court can order Defendant to pay damages and what the proper measure of damages is, and also whether the Court can enter

25

injunctive relief.

117.    **Typicality. FED. R. CIV. P. 23(a)(3))**.  Plaintiff's claims are typical of the claims of each Class member for the reasons alleged in the previous paragraph and in that the Plaintiff and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a permanent modification.  In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the Class.

118.    **Adequacy.** Plaintiff is an adequate representative of the Class because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent, she has retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously.  FED. R. CIV. P. 23(a(4).  Plaintiff and her Counsel will fairly and adequately protect the interests of members of the Class.

119.    **Superiority.**  As alleged previously, there are significant questions of law and fact common to the Class members.  These predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy.  FED. R. CIV. P. 23(b)(3).  The claims in this case and the circumstances of class members are such that individual prosecution would be extremely unlikely and would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct.  It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts.  Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court

26

system presented by the complex legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

120. **Injunctive Relief Appropriate for the Class.** Class certification is appropriate because Defendant has acted on grounds generally applicable to the Class, making appropriate equitable injunctive relief with respect to Plaintiff and the Class members. FED. R. CIV. P. 23(b)(2).

121. As described above, the Trial Period Plan Agreements sent by Defendant to Plaintiff and class members constituted valid contract offers.

122. By executing the Trial Period Plan Agreements and providing it to Defendant along with the supporting documentation, Plaintiff and class members accepted Defendant's offers.

123. Alternatively, Plaintiff's and class members' return of the Trial Period Plan Agreements constituted contract offers. Acceptance of these offers occurred when Defendant accepted Trial Period Plan Agreement payments.

124. The Trial Period Plan Agreement payments to Defendant by the Plaintiff and class members and their compliance with the other terms of the TPP Agreements, all of which actions were requested by Chase and none of which were pre-existing legal obligations, constituted consideration. By making those payments, Plaintiff and each class member gave up the ability to pursue other means of saving their homes, and Defendant received payments it might otherwise not have.

125.    As additional consideration, the Plaintiff and class members provided a large amount of private financial and other information to the Defendant, access to which it would not have otherwise had access.

126. Plaintiff and class members and Defendant thereby formed enforceable contracts.

127. By failing to offer permanent *HAMP* modifications, Defendant breached its contracts.

128.    In the alternative, Plaintiff alleges that she and each member of the class did reasonably rely upon representations made by Chase in and related to the Trial Period Plan Agreement to their determinant and plead that Chase be estopped from failing to perform in accordance with these representations.

129. Plaintiff and each class member have suffered actual damages and are threatened with additional harm from Defendant's breach. By making Trial Period Plan payments both during and after the Trial Period Contract, Plaintiff and class members lost other remedies that might be pursued to save their homes, such as restructuring their debt under the bankruptcy code, or pursuing other strategies to deal with their default, such as selling their home. On information and belief, some putative class members have suffered additional harm in the form of foreclosure activity against their homes.

130.    To the extent that actual damages will not fully and fairly compensate each class member, they are also entitled to specific performance and other appropriate injunctive relief.

**COUNT TWO:  VIOLATION OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. §1681(m)**

**CLASS CLAIM**

131.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

28

132.   **The FCRA Class**.  Pursuant to Rule 23 of the Federal Rules of Civil Procedure,

Plaintiff brings this action for herself and on behalf of a class (the "Class") initially defined as

follows:

> All natural persons who on any date on or after July 31, 2009, (a.)
> with regard to a mortgage loan secured by their personal residence,
> (b.) Chase received and reviewed a consumer credit report and/or
> credit scores in relation of a request for "Making Home
> Affordable Program Request For Modification", and thereafter (c.)
> did not approve or provide such modification because of a Net
> Present Value" calculation and for which (d.) Chase failed to
> provide the required oral, written, or electronic notice of the
> adverse action to the consumer, failed to provide the name, address
> and telephone number that furnished the report to Chase; failed to
> provide a statement that the consumer reporting agency did not
> make the decision to take adverse action and/or failed to provide
> the consumer with the appropriate notices as described in 15
> U.S.C. §1681j.
>
> Excluded from the class definition are any employees, officers,
> directors of Chase, any attorney appearing in this case, and any judge
> assigned to hear this action.

133.   **Numerosity.  FED. R. CIV. P. 23(a)(1).**   Plaintiff does not know the exact size or

identities of the members of the proposed class, since such information is in the exclusive control

of Defendant. However, on information and belief, Plaintiff alleges that the class encompasses

many hundreds of individuals whose identities can be readily ascertained from Defendant's

books and records. Therefore, the proposed class is so numerous that joinder of all members is

impracticable.

134.   **Existence and Predominance of Common Questions of Law and Fact.  FED.**

**R. CIV. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the Class.

These questions predominate over the questions affecting only individual members.  All

members of the class have been subject to and affected by the same conduct. These common legal and factual questions include, among other things and without limitation:

    a.    Whether the use of a consumer's credit score in a *HAMP* "net present value" calculation that results in the denial of an application for modification constitutes adverse action with respect to any consumer that is based in whole or in part on any information contained in a consumer report;

    b.    Whether Chase has reasonable procedures to assure compliance with the provisions of 15 U.S.C. §1681m;

    c.    Whether Chase's violations of 15 U.S.C. §1681m were willful;

    d.    What is the appropriate amount of statutory and/or punitive damages appropriate for Chase's violations of 15 U.S.C. §1681m.

135.    **Typicality. FED. R. CIV. P. 23(a)(3))**.  Plaintiff's claims are typical of the claims of each Class member for the reasons alleged in the previous paragraph and in that the Plaintiff and the other members of the class were subject to the same conduct and were met with the same refusal to provide a compliance notice of adverse action.  In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the Class.

136.    **Adequacy.** Plaintiff is an adequate representative of the Class because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent, she has retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously.  FED. R. CIV. P. 23(a)(4).  Plaintiff and her Counsel will fairly and adequately protect the interests of members of the Class.

137. **Superiority.** As alleged previously, there are significant questions of law and fact common to the Class members. These predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. FED. R. CIV. P. 23(b)(3). The claims in this case and the circumstances of class members are such that individual prosecution would be extremely unlikely and would prove burdensome and expensive given the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for the members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues raised by Defendant's conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

138. Defendant obtained the credit reports and/or credit scores of the Plaintiff and other putative class members as part of its procedure for calculating the "Net Present Value" component of *HAMP* eligibility.

139. Defendant thereafter denied the *HAMP* application of the Plaintiff and other putative class members based upon an inadequate "Net Present Value" output: Chase determined that based on the limited financial strength (one component of which was the credit worthiness of the applicants) of the Plaintiff and other class members, it would net more money if it let the subject homes go into foreclosure.

31

140.     Despite its systematic use of consumer credit reports as part of its *HAMP*
application process and its taking of adverse actions based in whole or in part on such
information, Chase did not have in place or follow procedures to provide a written notice of its
NPV and *HAMP* decisions or a statement of related rights under the FCRA to the Plaintiff and
other putative class members.

141.     Defendant had sufficient knowledge of the obligations and requirements
contained in and imposed by 15 U.S.C. §1681m.  The statutory language is unambiguous.  The
law has been in effect for many years.  There have been regulatory interpretations of §1681m
that would make it obvious to Chase that it was obligated to comply with this provision.  The
failure of the Defendant to send an adverse action notice to the Plaintiff on the credit denial
decision willfully violated the Fair Credit Reporting Act, 15 U.S.C. §1681m.

142.  The above-alleged actions and omissions of the Defendant violated the FCRA, 15
U.S.C. §1681(m).  The Plaintiff and the putative class are entitled to attorney's fees and costs
pursuant to 15 U.S.C. §1681n and §1681o.

143.     The Defendant is liable to the Plaintiff and the putative class for statutory
damages of $100.00 to $1,000.00 pursuant to 15 U.S.C. §1681n(a)(1)(A).

144.     The Defendant is liable to the Plaintiff and the putative class for punitive
damages pursuant to 15 U.S.C. §1681n(a)(2), and for attorneys fees and costs pursuant to
§1681n.

### COUNT THREE:  VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
### 15 U.S.C. §1691(d) and Virginia Code §59.1-21.21:1

### CLASS CLAIM

145.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

146.     **The ECOA Class**.  Pursuant to Rule 23 of the Federal Rules of Civil Procedure,
Plaintiff brings this action for herself and on behalf of a class (the "Class") initially defined as

follows:

> All natural persons who on any date on or after July 31, 2009, (a.) with regard to a mortgage loan secured by their personal residence (b.) located in the Commonwealth of Virginia, (c.) provided Chase a completed "Making Home Affordable Program Request For Modification and Affidavit" (Exhibit 9), and thereafter (d.) were not approved for the Modification.

> Excluded from the class definition are any consumers who received a written notice from Chase within 30 days of completing a *HAMP* application that provided a statement of reasons for the application denial and the additional statutory disclosures required under the ECOA.

> Also excluded from the class definition are any employees, officers, directors of Chase, any attorney appearing in this case, and any judge assigned to hear this action.

147.    **Numerosity.  FED. R. CIV. P. 23(a)(1).**   Plaintiff does not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendant. However, on information and belief, Plaintiff alleges that the class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendant's books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

148.    **Existence and Predominance of Common Questions of Law and Fact.  FED. R. CIV. P. 23(a)(2).**  Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual members.  All members of the class have been subject to and affected by the same conduct. These common legal and factual questions include, among other things and without limitation:

a.      The claims are based on form contracts and uniform loan modification

processing requirements;

b.      Whether Chase's rejection of class member applications for HAMP loan modifications constituted adverse actions;

c.      Whether in their application for the loan modifications consumers were applying for credit under the ECOA;

d.      Whether it was Chase' procedure to fail to send adverse action notice letters that complied with the ECOA; and

e.      Whether the Court can order Defendant to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

149.    **Typicality. FED. R. CIV. P. 23(a)(3))**.  Plaintiff's claims are typical of the claims of each Class member for the reasons alleged in the previous paragraph and in that the Plaintiff and the other members of the class were subject to the same conduct, signed the same application and were met with the same absence of a permanent modification.  In addition, Plaintiff is entitled to relief under the same causes of action as the other members of the Class.

150.    **Adequacy.** Plaintiff is an adequate representative of the Class because her interests coincide with, and are not antagonistic to, the interests of the members of the Class she seeks to represent, she has retained counsel competent and experienced in such litigation, and she intends to prosecute this action vigorously.  FED. R. CIV. P. 23(a)(4).  Plaintiff and her Counsel will fairly and adequately protect the interests of members of the Class.

151.    **Superiority.**  As alleged previously, there are significant questions of law and fact common to the Class members.  These predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient

adjudication of the controversy.  FED. R. CIV. P. 23(b)(3).  The claims in this case and the

circumstances of class members are such that individual prosecution would be extremely

unlikely and would prove burdensome and expensive given the complex and extensive litigation

necessitated by Defendant's conduct.  It would be virtually impossible for the members of the

Class individually to redress effectively the wrongs done to them.  Even if the members of the

Class themselves could afford such individual litigation, it would be an unnecessary burden on

the courts.  Furthermore, individualized litigation presents a potential for inconsistent or

contradictory judgments and increases the delay and expense to all parties and to the court

system presented by the complex legal and factual issues raised by Defendant's conduct.  By

contrast, the class action device will result in substantial benefits to the litigants and the Court by

allowing the Court to resolve numerous individual claims based upon a single set of proof in just

one case.

152.   **Injunctive Relief Appropriate for the Class.**  Class certification is appropriate

because Defendant has acted on grounds generally applicable to the Class, making appropriate

equitable injunctive relief with respect to Plaintiff and the Class members. FED. R. CIV. P.

23(b)(2).

153.   The "Making Home Affordable Program Request For Modification and

Affidavit" completed by the Plaintiff and each putative class member was a completed

application for credit.  In each instance, the Plaintiff or other class member was asking Chase to

obtain more favorable credit terms.

154.   At all times relevant hereto, it was Chase' policy not to send timely notice letters

to consumers when it denied their applications as alleged.

155.   Chase also failed to provide an adequate statement of reasons for its adverse action

to Plaintiff and the class members as required under the ECOA.

156.  Chase also failed to provide the statutory disclosures required by the ECOA to Plaintiff and the class members as required under the ECOA.

157.  The above-alleged actions and omissions of the Defendant violated the ECOA, 15 U.S.C. §1691(d) and the Virginia Equal Credit Opportunity Act (VECOA), Virginia Code §59.1-21.21:1.  The Plaintiff and the putative class are entitled to attorneys fees and costs pursuant to 15 U.S.C. §1691e and Virginia Code § 59.1-21.23.

158.    The Defendant is liable to the Plaintiff and the putative class for punitive damages of $10,000.00 per violation pursuant to Virginia Code § 59.1-21.23.  The Defendant's violations were widespread, without legal justification, and greatly impacted class members.  Given the net worth of Chase, it is also unlikely that any lesser remedy would adequately deter it from further non-compliance.

159.    The Plaintiff and the putative class are entitled to declaratory and injunctive relief requiring the Defendant's compliance with the ECOA pursuant to 15 U.S.C. §1691e.

## COUNT FOUR: VIOLATION OF FAIR CREDIT REPORTING ACT
## 15 U.S.C. §1681s-2(b) (1)(A)

### INDIVIDUAL CLAIM

160. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

161.  On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, *Chase* violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(1)(A) by failing to fully and properly investigate the Plaintiff's disputes of the *Chase* reporting that were made through Equifax, Trans Union and Experian.

162.  As a result of this conduct, action and inaction of *Chase*, the Plaintiff suffered actual

damages including without limitation, by example only and as described herein on Plaintiff's behalf by counsel: loss of employment, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

163.  *Chase's* conduct, actions and inactions were willful, rendering *Chase* liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, *Chase* was negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

164.  The Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys fees from *Chase* in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT FIVE: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. §1681s-2(b) (1)(B)

### INDIVIDUAL CLAIM

165. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

166.  On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, *Chase* violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(1)(B) by failing to review all relevant information provided by the consumer reporting agencies upon the Plaintiff's dispute.

167.  As a result of this conduct, actions and inactions of *Chase* the Plaintiff suffered actual damages including without limitation, by example only and as described herein on Plaintiff's behalf by counsel: loss of employment, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

168. *Chase's* conduct, actions and inactions were willful, rendering *Chase* liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, *Chase* was negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

169.  The Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys fees from **Chase** in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

### COUNT SIX: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. §1681s-2(b) (1)(C) and (D)

### INDIVIDUAL CLAIM

170.  Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

171.  On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, **Chase** violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2b(1)(C) and (D) after her disputes through Equifax, Trans Union and Experian by publishing the **Chase** within Plaintiff's credit file with Equifax and Experian without also including a notation that this debt was disputed and by failing to correctly report results of an accurate investigation to each other credit reporting agency.

172.  As a result of this conduct, actions and inactions of **Chase**, the Plaintiff suffered actual damages including without limitation, by example only and as described herein on Plaintiff's behalf by counsel:  loss of employment, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

173.  **Chase's** conduct, actions and inactions were willful, rendering **Chase** liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, **Chase** was negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

174.  The Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys fees from **Chase** in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

### COUNT SEVEN: DEFAMATION

**INDIVIDUAL CLAIM**

175. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

176.    Chase published the false representation that plaintiff was defaulted and had refused to timely pay her mortgage obligation to each consumer reporting agency at least once per month for each month in the year starting prior to the filing of this lawsuit and then continuing through the present.

177.    These defamations were made with legal malice and a willful intent to injure the plaintiff by placing derogatory information on her credit reports.  Chase had reason to know, both by virtue of information communicated to it by plaintiff and by its own records, that plaintiff had not refused to pay her obligation and that she was fully in compliance therewith. Further, Chase willfully adopted procedures that wholly ignored the demands of plaintiff, and other consumers generally, that inaccurate information should be removed from their credit files.

178.    As a result of Chase's conduct, actions and inaction, the plaintiff suffered various types of damage as set forth herein, including specifically, the loss of employment, loss of credit, the loss of the ability to purchase and benefit from a line of credit, and the mental and emotional pain, anguish, humiliation and embarrassment of credit denials.

179.    These defamations were malicious, willful, deliberate, intentional and/or with reckless disregard for the interests and rights of plaintiff, so as to justify an award of punitive damages against Chase in an amount to be determined by the Court.

**COUNT EIGHT: VIOLATION OF
REAL ESTATE SETTLEMENT PROCEDURES ACT
12 U.S.C. §2605(e)**

**INDIVIDUAL CLAIM**

180. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

181.  On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, the Plaintiff made multiple qualified written requests to Chase insisting that it process her *HAMP* application, correct inaccurate credit reporting and otherwise provide information regarding her loan.

182.   On nearly each occasion alleged in this Complaint, the Plaintiff's written communication was sent to the address at which she was instructed by Chase.

183.   On nearly each occasion in which the Plaintiff did make her qualified written requests, **Chase** violated the Real Estate Settlement Procedures Act, 12 U.S.C. §2605(e) by:

a.      Failing to timely or at all provide a written notice of receipt of inquiry;

b.      Failing to timely or at all to conduct an appropriate investigation of the Plaintiff's inquiry;

c.      Failing to timely or at all to provide the Plaintiff a true and correct written explanation or clarification; and

d.      Continuing to report information regarding allegedly overdue payments to the national credit bureaus.

184.   As a result of this conduct, actions and inactions of **Chase**, the Plaintiff suffered actual damages including without limitation, by example only and as described herein on Plaintiff's behalf by counsel:  loss of employment, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

185. **Chase** is liable for actual damages in an amount to be determined by the Court pursuant to 15 U.S.C. §2605(f).

186.   As alleged in the Complaint, Chase's conduct appears to be a pattern and practice

of misconduct with many consumers.  It is certainly so with the numerous violations alleged as to the Plaintiff.  For each violation of 12 U.S.C. §2605(e), Chase is thus also liable to the Plaintiff for additional damages up to $1,000 per violation.

187.    The Plaintiff is entitled to recover costs and attorneys fees from **_Chase_** in an amount to be determined by the Court pursuant to 12 U.S.C. §2605(f)(3).

**WHEREFORE**, Plaintiff respectfully requests the following relief:

a. Certify the ECOA, FCRA (§1681m) and Contract claims in this case as a class action and appoint the named Plaintiff to be class representative and her counsel to be class counsel;

b. Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required to offer permanent modifications to class members on the terms promised in class members' temporary modifications;

c. Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff and the members of the Class;

d. Order Defendant to adopt and enforce a policy that requires appropriate training of its employees and agents regarding their duties under _HAMP_;

e.      Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

f.  Award actual, statutory, and punitive damages as pled;

g. Award Plaintiff and her counsel attorneys fees and the costs of this action, including the fees and costs of experts;

h. Grant Plaintiff and the Class such other and further relief as this Court finds

necessary and proper.

**TRIAL BY JURY IS DEMANDED**.

                                             **MICHELLE BOURDELAIS,**

                                        /s/

                                     Leonard A. Bennett, Esq.
                                     VSB #37523
                                     Attorney for Plaintiff
                                     CONSUMER LITIGATION
                                     ASSOCIATES, P.C.
                                     12515 Warwick Boulevard, Suite 100
                                     Newport News, Virginia 23606
                                     (757) 930-3660 - Telephone
                                     (757) 930-3662 – Facsimile
                                     lenbennett@cox.net

Of counsel:

Charles Delbaum (BBO 543225), *Pro Hac Vice* pending
Stuart Rossman (BBO 430640), *Pro Hac Vice* pending
Arielle Cohen, *Pro Hac Vice* pending
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
Tel: (617) 542-9595
Fax: (617) 542-8010

Gary Klein (BBO 560769), *Pro Hac Vice* pending
Shennan Kavanagh (BBO 655174), *Pro Hac Vice* pending
Kevin Costello (BBO 669100), *Pro Hac Vice* pending
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of December, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

David Neal Anthony
Troutman Sanders LLP
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23218-1122
E-mail:  david.anthony@troutmansanders.com

Nancy Renee Thomas
Morrison & Foerster, LLP
555 West Fifth Street
Suite 3500
Los Angeles, CA 90013
E-mail: nthomas@mofo.com

Timothy A. O'Brien
Morrison & Foerster, LLP
2000 Pennsylvania Avenue NW
Suite 6000
Washington, DC 20006-1888
E-mail:  tobrien@mofo.com

                                    /s/
                        Leonard A. Bennett, Esq.
                        VSB #37523
                        Attorney for Plaintiff
                        CONSUMER LITIGATION
                        ASSOCIATES, P.C.
                        12515 Warwick Boulevard, Suite 100
                        Newport News, Virginia 23606
                        (757) 930-3660 - Telephone
                        (757) 930-3662 – Facsimile
                        lenbennett@cox.net

43