## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

**MICHELLE BOURDELAIS,**
 *(formerly Michelle Durniak)*,

**Plaintiff,**

v.                                                          **Civil No. 3:10-cv-00670-HEH**

**J.P. MORGAN CHASE BANK, NA,**

**and**

**CHASE HOME FINANCE, LLC,**

**Defendants.**

## FOURTH AMENDED COMPLAINT

COMES NOW the Plaintiff, **MICHELLE BOURDELAIS,** *(formerly Michelle Durniak)*, by

counsel, as and for her Fourth Amended Complaint against the Defendants, she alleges as follows:

## PRELIMINARY STATEMENT

1.       This is an action for actual, statutory and punitive damages, costs and attorney's fees

brought pursuant to the Federal Fair Credit Reporting Act (FCRA) 15 U.S.C. §1681 et seq., (an

individual accuracy claim and a claim for failure to send a proper denial letter) the Federal Equal

Credit Opportunity Act (ECOA), 15 U.S.C. §1681, et seq. (for failure to send a lawful denial letter)

and the Real Estate and Settlement Procedures Act (RESPA) as well as for state claims of Breach of

Contract (and in the alternative Promissory Estoppel), Fraud and Defamation.

2.       Defendants J.P. Morgan Chase Bank, NA and Chase Home Finance, LLC

(collectively "Chase") operate as a single mortgage lender and servicer.

3.       At its simplest, the individual Fair Credit claim in this case alleges that Chase

inaccurately reported the Plaintiff as having defaulted on her mortgage and otherwise having violated her obligations to her creditor.  There is no objective basis for Chase to have reported this to the credit bureaus.  For all of her financial struggles over the last years of her relationship with Chase, Ms. Bourdelais has paid her mortgage and honored her obligations in the manner that Chase had insisted.

4.     When Plaintiff learned that Chase had inaccurately reported her as in default, and that such inaccuracies had destroyed her credit, she began a dispute process, both directly to Chase as well as through the national credit bureaus.  Chase then refused to investigate or correct its defamatory reporting.  In doing so, it violated both the FCRA and the RESPA.

5.     The Plaintiff is obligated on a note securing the property and a deed of trust, both of which are enforceable contracts.

6.     In 2008, Chase accepted $25 billion in funds from the United States Government as part of the Troubled Asset Relief Program ("TARP"), 12 U.S.C. § 5211. On July 31, 2009 Michael R. Zarro Jr., Sr. Vice President of J.P. Morgan Chase Bank, NA signed a contract with the U.S. Treasury (attached as Exhibit 1 and included by reference) agreeing to participate in HAMP -- a program in which Chase received incentive payments for providing affordable mortgage loan modifications and other alternatives to foreclosure to eligible borrowers. Defendant J.P. Morgan Chase Bank, NA entered into agreements with the United States Treasury and with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

7.     As a participating servicer in HAMP, Chase has, in turn and through Chase Home Finance, LLC, entered into written agreements with consumers for temporary trial modifications. Consumers like the Plaintiff have complied with these agreements by submitting the required

2

documentation and making payments required by Chase.

8.     Importantly, it is this "Consumer to Chase, Chase to Consumer" direct contract for which the Plaintiff seeks a remedy rather than the "Chase to U.S. Government, U.S. Government to Chase" agreement.  The former is a simple common law contract to which the consumer is a party, while in the latter, she is a third party.

## JURISDICTION

9.  This Court has federal question jurisdiction under the FCRA, 15 U.S.C. §1681p, the ECOA, 15 U.S.C. §1691e and RESPA, 12 U.S.C. § 2605(f), 28 U.S.C. §1331.

10. This court also has jurisdiction over the state law claims by supplemental jurisdiction 28 U.S.C. §1367, and by diversity, 28 U.S.C. §1332.   The parties are residents of different states.

11.  This case was first filed within the applicable limitations period for each claim.

12. Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District and Division, Defendant regularly conducts business in here, and the named Plaintiff resides here.

## PARTIES

13.  The Plaintiff is a natural person and resident of the State of Virginia.  Plaintiff is a "consumer" and "person" protected by the FCRA, ECOA and RESPA.

14.     Defendant J.P. Morgan Chase Bank, NA (*referred herein collectively as "Chase"*) is the entity that formally entered into the TARP contract with the Department of Treasury in which Chase agreed collectively to accept and process lawfully HAMP loan modification applications.

15.  Upon information and belief, Chase Home Finance, LLC**.,** *(referred herein collectively as "Chase") is* a foreign limited liability company doing business as a mortgage originator and servicer and at all times relevant hereto was a "furnisher" as governed by the FCRA and a "creditor"

3

as governed by the ECOA.

16.     On information and belief, Plaintiff alleges that Chase Home Finance, LLC operates as a wholly controlled agent of J.P. Morgan Chase Bank, NA.  Management is not independent.   For all purposes of this action the two Defendants are one and the same.

17.   Upon  information  and  belief,  **EQUIFAX  INFORMATION  SERVICES,  LLC.** ("***Equifax***") is a corporation authorized to do business in the State of Virginia through its registered offices in Richmond, Virginia.

18.   Upon information and belief, ***Equifax*** is a "consumer reporting agency", as defined in 15 U.S.C.  §1681(f).   Upon information and belief,  ***Equifax***  is regularly engaged in the business of assembling,  evaluating,  and  disbursing  information  concerning  consumers  for  the  purpose  of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.   Upon information and belief, ***Equifax*** disburses such consumer reports to third parties under contract for monetary compensation.

19.   Upon information and belief, **EXPERIAN INFORMATION SOLUTIONS, INC.** ("***Experian***") is a corporation authorized to do business in the State of Virginia through its registered agent office.

20.   Upon information and belief, ***Experian*** is a "consumer reporting agency", as defined in 15 U.S.C. §1681(f).  Upon information and belief, ***Experian*** is regularly engaged in the business of assembling,  evaluating,  and  disbursing  information  concerning  consumers  for  the  purpose  of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.  Upon information and belief, ***Experian*** disburses such consumer reports to third parties under contract for monetary compensation.

4

21. Upon information and belief, **TRANS UNION, LLC**. ("*Trans Union*") is a corporation authorized to do business in the State of Virginia through its registered offices in Richmond, Virginia.

22. Upon information and belief, *Trans Union* is a "consumer reporting agency", as defined in 15 U.S.C. §1681(f). Upon information and belief, *Trans Union* is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. §1681(d) to third parties.

23. Upon information and belief, *Trans Union* disburses such consumer reports to third parties under contract for monetary compensation.

## FACTUAL BACKGROUND
### *The Foreclosure Crisis*

24. Over the last five years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight U.S. mortgages is currently in foreclosure or default.[1] Virginia reported 17,669 properties with foreclosure filings for the second quarter of 2010, the 11th highest activity level in the nation. The latest total represents a 22 percent increase from the first quarter of the year and nearly 15 percent above the level reporting for the second quarter of 2009.[2]

25. Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that

---

1 Congressional Oversight Panel, Oct. 9, 2009 report at 3. Available at http://cop.senate.gov/reports/library/report-100909-cop.cfm.

2 www.realtytrac.com/ContentManagement/Library.aspx?ChannelID=13&ItemID=9600

5

suffer decreased property values and municipalities that lose tax revenue.

### *Creation of the Home Affordable Modification*

26.     Motivated in significant part by such concerns, Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 et. seq. (2009).

27.     The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. §5201.

28.  The Act established the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211.  In exercising its authority to administer TARP, the Act mandated that the Secretary of Treasury take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).   It further mandated that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures" and to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable

foreclosures." 12 U.S.C.A. §5219.

29.  On February 18, 2009, the Treasury Secretary and the Director of the Federal Housing Finance Agency created a uniform loan modification protocol now known as the Home Affordable Modification Program, or HAMP, the program that is at issue in this case.

30.  HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is

TARP money.

31.   Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1000.00 for each HAMP modification.

### Chase's Broken Promises Under HAMP

32.   The mortgage industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. *Chase* is a servicer and its actions described herein were made as agents for the entities that hold mortgage loans.

33.   Should a servicer elect to participate in HAMP, they execute a Servicer Participation Agreement ("SPA") with the federal government.[3] On July 31, 2009, Michael R. Zarro Jr., Sr. Vice President of J.P. Morgan Chase Bank, NA, executed an SPA, thereby making *Chase* a participating servicer in HAMP. (A copy of this SPA is attached hereto as Exhibit 1.)

34.   The SPA executed by *Chase* incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program

---

3 Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program are subject to mandatory inclusion in HAMP. Otherwise, participation by servicers in the HAMP program is voluntary.

Documentation" (SPA 1.A.), and are incorporated by reference herein.

35. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services." (SPA 1.A., 2.A.)[4]

36. A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan.[5] The Trial Period Plan defines a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

37. Chase offers Trial Period Plans to eligible homeowners by way of a Trial Period Plan Agreement, which describes the homeowner's duties and obligations under the plan and contractually promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

38. If the homeowner executes the Trial Period Plan Agreement, complies with objective documentation requirements and makes all three Trial Period Contract monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

39. There is no lender or servicer discretion involved or permitted. Once the

---

4 The Program Documentation also includes Supplemental Directive 09-01 ("SD 09-01," attached hereto as Exhibit 2), Home Affordable Modification Program; Base Net Present Value (NPV) Model Specifications ("NPV Overview," attached hereto as Exhibit 3) and Supplemental Documentation—Frequently Asked Questions ("HAMPFAQS," attached hereto as Exhibit 4) and Supplemental Directive 09-08 ("SD 09-08," attached hereto as Exhibit 5). These documents together describe the basic activities required under HAMP and are incorporated by reference in both of the TPP Agreements signed by Plaintiff.

5 The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01, attached hereto as Exhibit 2. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

servicer/lender contracts a Trial Period Plan, the consumer will be entitled to a permanent modification so long as they produce the defined set of documents required to verify the facts previously stated and also comply with the plan payment requirements during the Trial Period. Further, the terms of that permanent modification are also non-discretionary and are objectively determinable for each consumer based on the "waterfall" analysis required under the HAMP program.

40. *Chase* has routinely failed to live up to its end of Trial Period Plan Agreements and to offer permanent modifications to homeowners. In January 2010, the U.S. Treasury reported that *Chase* had 424,965 HAMP-eligible loans in its portfolio. Of these loans, just 7,139 resulted in permanent modifications (approximately 1.7 %) even though many more homeowners had made the payments and submitted the documentation required by their Trial Period Plan Agreement. The Treasury Report is attached hereto as Exhibit 6.

41. By failing to live up to the Trial Period Plan Agreements and convert them into permanent loan modifications, *Chase* is not only leaving homeowners in limbo and stressful anxiety, wondering if their home can be saved, *Chase* is also preventing homeowners from pursuing other avenues of resolution, including obtaining alternate lending or using the money they are putting toward Trial Period Plan payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their default or reducing the harm from it.

### *HAMP Credit Reporting Guidelines*

42. In addition to various program procedures created to instruct *Chase* and other servicers on creation and implementation of trial plans and permanent modifications, the program created very

specific requirements and a protocol to govern credit reporting for HAMP consumers.

43.     The Fannie Mae Servicing Guide, Part VII, Section 107: "Notifying Credit Repositories", which governed **Chase** in these regards, requires that a servicer continue to report a "full-file" status report (describing the exact status of each mortgage loan it is servicing as of the last business day of each month) to the four major credit repositories for each loan under the HAMP and to do so in accordance with the Fair Credit Reporting Act and credit bureau requirements established through the Consumer Data Industry Association (the "CDIA").

44.     The CDIA 2010 Mortgage & Home Equity Reporting Guidelines, attached hereto as Exhibit 7, define the industry standard for "accuracy" and in relevant part state verbatim:

**Reporting Guidelines for Trial Period:**

The guidelines below should be followed when reporting payments during the trial period:

1. *Current, but facing imminent default or Current, but eligible for loan modification*.

If the consumer was current with payments prior to the trial period, and they make each month's payment on time, report the consumer as current (Account Status 11) during the trial period. If the consumer is at least 30 days past due during the trial period, report the Account Status Code that reflects the appropriate level of delinquency.

Special Comment Code 'AC' (Paying under a partial or modified payment agreement) should also be reported.

Note: Effective November 2010, the verbiage for Special Comment Code 'AC' will be "Paying under a partial payment agreement".

2. *Delinquent*.

If the consumer was delinquent (at least 30 days past the due date) prior to the trial period and the reduced payments do not bring the account current, report the

10

Account Status Code that reflects the appropriate level of delinquency.

Special Comment Code 'AC' (Paying under a partial or modified payment agreement) should also be reported.

Note: Effective November 2010, the verbiage for Special Comment Code 'AC' will be "Paying under a partial payment agreement".

45.    Summarized simply – the CDIA credit-reporting standards require that a consumer who is not yet in default when they enter into a Trial Period Plan Agreement is not to be reported as delinquent or in default thereafter.  "If the consumer was current with payments prior to the trial period, and they make each month's payment on time, report the consumer as current … during the trial period."

### *Facts Regarding the Plaintiff*

46.  Plaintiff and her husband purchased their home on Lake West Terrace in Glen Allen, Virginia in December 2005.

47.  At the time of the purchase, the Plaintiff and her husband took out a $350,800.00 mortgage loan with Weichert Financial Services.

48.  In January 2006, the Plaintiff and her husband made a principal curtailment lump sum payment to Weichert Financial Services in the amount of  $27,523.00.

49.  The servicing of the Plaintiff's mortgage was transferred sometime thereafter to *Chase.*

50.  The Plaintiff and her husband consistently paid their mortgage on time.

51.  On or about January 2009 the Plaintiff's contract employment ended and on or about February 2009, the Plaintiff's husband was laid off from his employment, all within a matter of 39 days.

52.  On or about March 13, 2009 Plaintiff and her husband forwarded a letter to **Chase** with the requested documentation including the Chase Borrowers Assistance Form signed on March 10, 2009, income verification documents and the required signed 4506-T Request for Tax Return form to be considered for the Home Affordable Mortgage Program (hereinafter referred to as "*Hamp")*.

53.  On or about April 6, 2009 the Plaintiff and her husband forwarded a letter with additional documentation to their assigned workout analyst and again pleaded for a one time loan modification based on their hardship.

54.  The Plaintiff and her husband were – inaccurately - advised by the **Chase** employee that because they were current on their mortgage at the time, they would need to skip their mortgage payment for the month of May in order to qualify in order to be eligible for the requested *Hamp* program.  **Chase** inaccurately represented, as it regularly does, that the consumer must be in actual default rather than simply "at risk of imminent default."

55.  Plaintiff and her husband had never been late on any payments on any credit accounts or mortgages.

56.  On or about April 14, 2009 an Order was entered by the Henrico Circuit Court wherein the Plaintiff's name was changed from Michelle Lyn Bourdelais-Durniak to Michelle Lyn Bourdelais.

57.  On or about May 7, 2009 **Chase** forwarded a letter to the Plaintiff and her husband stating that it was extending a forbearance for a period of time.  The Plaintiff and her husband were required to pay a reduced payment of $1,346.18 for the months of June and July 2009 in order to remain current on their loan and avoid default.  The Plaintiff was under the impression that this was the first trial period (TTP) towards a full loan modification and paid all payments on time exactly as

12

*Chase* had instructed.

58.  On or about June 22, 2009 the Plaintiff and her husband separated, however the Plaintiff continued to reside in the home with the parties two young children.

59.  On or about August 1, 2009 *Chase* forwarded to the Plaintiff a document entitled "Home Affordable Modification Trial Period Plan (Step One of Two Step Documentation Process)", which stated that the plan was effective on August 1, 2009 and would run from August 2009 to October 2009.  The Plaintiff's monthly mortgage payments were reduced to the amount of $1,535.57.  The Plaintiff and her husband signed the form along with another 4506-T Request for Transcript of Tax Form on August 10, 2009 and August 9, 2009, respectively, and forwarded all of the required documentation back to *Chase* prior to the August 14, 2009 deadline indicated on the correspondence.

60.  This Trial Period Plan Agreement was entitled "Home Affordable Modification Program Loan Trial Period," and the first sentence of the agreement provides: "If I am in compliance with this Loan Trial Period and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Loan Modification Agreement, as set forth in Section 3 [below], that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage." Section 3 of the Trial Period Contract Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

61. The Trial Period Plan Agreement further provides in Section 2 that the Loan Modification Agreement will be effective on "the first day of the month following the month in which the last Trial Period Payment is due," and that "TIME IS OF THE ESSENCE."

13

62.  Plaintiff timely made each of the payments provided for in the Trial Period Contract Agreement due in August, September and October 2009. She has also timely made payments for October, November and December 2009 and February 2010 through the present, consistent with her Trial Period Plan Agreement payment amount.

63. Unlike payments made pursuant to plaintiff's loan agreement with *Chase*, *Chase* did not apply these payments to reduce, even in part, the principal balance on plaintiff's loan, but rather placed said payments in an escrow account.

64.  Plaintiff made numerous contacts with *Chase* during the months of August and September 2009 with regard to the status of her *HAMP* modification.

65.  In September 2009, *Chase* represented to the Plaintiff that it was undergoing system changes that have inadvertently delayed completions of modifications.  Plaintiff was further advised that until the system changes were finalized, the Plaintiff should continue to make the estimated modification payment that was provided in the trial payment plan.

66.  On or about September 16, 2009 Plaintiff forwarded additional requested documents to *Chase.*

67.  By this period, the Plaintiff had learned that Chase was reporting to the credit bureaus that her loan was in default.  She then requested that *Chase* contact the bureaus to update the errors on her credit report.

68.  Out of nowhere, in late September 2009, *Chase* then sent to the Plaintiff a document titled "Acceleration Warning – Notice of Intent to Foreclose."  *Chase* asserted that the Plaintiff was in default because she had failed to pay the required installments and that the total amount past due on her loan was now $7,020.72.  This claim was false, as the Plaintiff had made all of her requested

14

payments on time.

69.    In this same period and through this now significant set of events, the Plaintiff continued to contact and attempt communication with *Chase*, all of it to no avail.

70.  On or about October 5, 2009 the Plaintiff received an electronic mail from a Chase Representative stating in relevant as follows.

> "…While I appreciate your sense of urgency regarding the completion of your modification, I am not in a position to commit to having final modification documentation delivered within your requested time frame of November 1, 2009. As I explained previously, Chase is completing changes to the servicing systems in order to accommodate modification changes. Once Chase is positioned to service modified loans, we will move forward as quickly as possible. It is important to understand that there are no commitments made by the investor, or the lender, to have a modification completed within a particular timeframe. Modifications are completed as quickly as possible, and every effort will be made to ensure you receive the most prompt service as possible."

71.    On or about October 16, 2009 the Plaintiff received yet another letter from *Chase* stating that her Modification was at risk.  *Chase* advised that it was still missing documents that the Plaintiff had previously forwarded to *Chase* numerous times.   The Plaintiff again provided the requested documentation.

72.  On or about November 30, 2009 the Plaintiff received a letter from Chase that again her modification was at risk because it did not have a completed 4506-T Request for Copy of Tax Return.  Again this document had been provided numerous times.  The Plaintiff again provided the requested document.

73.  On or about January 4, 2010 the Plaintiff received correspondence from the Chase Home Lending Executive Office in response to the Plaintiff's October 1, 2009 electronic correspondence. *Chase* responded that the implementation of the modification had not occurred because *Chase* still

needed updated documents including further income information, copies of bank statements and another signed 4506-T Request for Copy of Tax Return. The Plaintiff again faxed all of the requested documents to **Chase**. She did so on January 7, 2010.

74. On or about January 8, 2010 the Plaintiff received another letter from **Chase** stating that **Chase** had not received all of the required documents to complete the request for modification and again requested a copy of her most recent bank statements. Plaintiff immediately re-faxed this information.

75. On or about January 16, 2010 the Plaintiff forwarded a letter to the Chase Executive Resolutions Department pleading for help in obtaining implementation of the permanent modification on her loan.

76. On or about January 31, 2010 the Plaintiff received a letter from the Chase Fulfillment Center that her modification was at risk and that her urgent response was needed. **Chase** represented (again) that it had not received all of the required documents to complete the request for modification and needed (again) a signed 4506-T Request for Copy of Tax Return. The Plaintiff again provided the requested documents.

77. On or about February 16, 2010 Plaintiff received another "Acceleration Warning – Notice of Intent to Foreclose from Chase" letter. The letter claimed that the Plaintiff was in default because she had failed to pay the required installments commencing with the payment due September 1, 2009 and that the total amount past due on the loan was now $13,653.58. (Ironically, the letter also stated that the Plaintiff's loan "might be eligible for loan modification" and insisted, "Call us now!")

78. On or about April 7, 2010 a Quit Claim deed between the Plaintiff and her ex-husband

was recorded transferring the property ownership solely to the Plaintiff.

79.   On or about April 7, 2010 the Plaintiff received electronic correspondence from **Chase** that stated regarding Plaintiff's unemployment that **Chase** needed a copy of a document showing the amount and duration of her unemployment benefits, a Court Order and proof of payments for the consideration of child support income and the Quitclaim deed.   **Chase** represented that upon its receipt of the recorded Quit Claim Deed, it would be able to implement the permanent loan modification and that **Chase** would escalate the process once the information was received.

80.   On or about May 24, 2010 Plaintiff forwarded to **Chase** via fax a copy of her Retirement Statement along with copies of her bank account numbers with pin numbers from Wachovia that had been requested by **Chase**.

81.   On or about May 25, 2010 Plaintiff again forwarded via fax a copy of her Retirement Statement along with copies of her bank account numbers with pin numbers from Wachovia that had been requested by **Chase**.

82.   On or about May 7, 2010 out of sheer exhaustion the Plaintiff retained attorney Brian Stevens to help her facilitate her continued contacts with **Chase** to obtain the modification on her loan.   On this date Attorney Stevens forwarded a letter via Federal Express delivery to **Chase** advising of his representation and provided additional copies of the loan modification paperwork that had previously been submitted numerous times by the Plaintiff.    In addition Attorney Stevens provided the recorded Quit Claim Deed and a copy of the Consent Order awarding the Plaintiff child support each month to be paid by her estranged husband.

83.   On or about May 11, 2010 Attorney Stevens forwarded another letter to **Chase** regarding the Plaintiff's unemployment determination and payment stubs provided as income verification from

the Virginia Employment Commission.  He also sent along a copy of the *HAMP* regulations documenting that both child support and unemployment compensation be considered as valid income.

84.  On or about May 12, 2010 **Chase** confirmed to the Plaintiff that it had scanned her information into the documentation system.  However, it then demanded that the Plaintiff fill out again all of the same forms previously provided as well as provide yet another signed 4506-T Request for Copy of Tax Return.

85.  On or about May 12, 2010 the Plaintiff forwarded to **Chase** by certified mail copies of her bank statements.  And on May 13, 2010, she forwarded (again) all of the additional documents **Chase** had demanded.  The Plaintiff also pleaded that she has done everything **Chase** has asked her to do with regard to obtaining her loan modification since May 2009.

86.  On or about May 14, 2010 Plaintiff received a phone call from **Chase** confirming receipt of the Plaintiff's fax however, the **Chase** employee now stated that it would need paper bank statements instead of online bank statements and requested that the Plaintiff refax the paper statements.  Plaintiff immediately did so.

87.  On or about May 17, 2010 the Plaintiff faxed a letter to the CEO of Home Lending at **Chase**, pleading for it to provide the permanent loan modification as previously contracted in the Trial Period Plan Agreement.   It had by then been fourteen months since **Chase** became so obligated.

88.  On or about May 17, 2010 the Plaintiff received a letter from **Chase** addressed to John R. Durniak and Michelle L. Durniak.  (in which **Chase** failed to have processed the change of name or the Quit Claim deed processes.)  **Chase** advised that the Plaintiff's mortgage account

18

required "immediate attention" as follows:

> Thank you for participating in the Chase Home Affordable Modification Program – we are writing to inform you that we have not received all documents necessary to complete your request for modification.  We cannot continue your request for a Chase Home Affordable Mortgage Program because the documents we need are:
>
>> A Request for Modification and Affidavit
>> A completed 4506-T-EZ Short form Request for Individual Tax Return Transcript
>> A completed 4506-T Request for Transcript of Tax Return

89.  On or about May 17, 2009 and May 19, 2009 Plaintiff faxed to *Chase* her bank account numbers, fully exposed 16 digits as *Chase* claimed it required, along with the Plaintiff's PIN numbers for each of the bank accounts.

90.  On or about May 18, 2010, Attorney Stevens faxed to the *Chase* CEO Home Lending, Loss Mitigation Department and the Executive Resolution Department copies of the Plaintiff's 2008 and 2009 signed tax returns,  documentation on the Plaintiff's T. Rowe Price Retirement Accounts, Plaintiff's bank account information provided and notarized by Wachovia Bank, copies of the real estate comparables for the Net Present Value determination in the *HAMP* process and a copy of the Plaintiff's FICO credit report.

91.  On or about May 18, 2010 the Plaintiff had a conference call with *Chase* and the Plaintiff's estranged husband.  The *Chase* representative stated that she couldn't find the 2008 signed tax returns in the packet Plaintiff had sent and that this was all that was needed for completion.   Plaintiff reconfirmed that the 2008 were in the packet and further advised that she would Federal Express mail additional copies.  This package was received by *Chase* on May 20, 2010.

92.  On or about May 19, 2010, Attorney Stevens faxed a letter to *Chase* with regard to the

2008 tax returns previously forwarded and provided additional copies of all of the previously submitted documentation including the 2008 tax returns via Federal Express delivery.  This package was confirmed received by **Chase** on May 20, 2010.

93.   On or about May 20, 2010 Plaintiff received a voice mail from **Chase** that all of the Plaintiff's documentation was completed and under review.

94.   On or about May 22, 2010 Plaintiff received a letter from **Chase** Letter titled, "Making Home Affordable Modification Trial Period Plan Offer – Notice of Expiration."  **Chase** advised that it was writing to notify that the trial period plan agreement had expired because:

> "[Y]ou did not provide us with the documents we requested.  A notice, which
> listed specific documents we needed and the time frame required to provide them,
> was sent to you previously."

95.   On or about June 17, 2010, **Chase** forwarded a copy of a letter addressed to the Plaintiff to Senator Mark Warner's office purportedly responding to the Plaintiff's letter to Mark Warner dated May 17, 2010 regarding her issues with **Chase**.  The letter stated that the Plaintiff was ineligible for the *HAMP* program because of the Net Present Value Determination (NPV) made by **Chase**.[6]  Plaintiff has never personally received an original letter from **Chase** as addressed – a copy of this letter was sent solely to Mark Warner's office and Mark Warner's office subsequently faxed a copy of the letter to her.  This was the only written statement the Plaintiff has seen attempting to explain Chase's reason for denying her permanent modification.

96.  On or about July 2, 2010 **Chase** forwarded yet another "Acceleration Warning - Notice of Intent to Foreclose" letter claiming that the Plaintiff is in default because she has failed to pay the

---

6  The "Net Present Value Determination" is one of the eligibility factors a servicer is to determine before agreeing to contract a Trial Period Plan.  Essentially, it tries to determine if the lender would be better off if the mortgage loan

required payments since January 1, 2010 and that she was now $15,407.08 in arrears in the payment of her mortgage.

97.  On or about July 7, 2010, Attorney Brian Stevens forwarded a letter via express delivery to **Chase** requesting the NPV calculations referenced in the **Chase** letter to Senator Warner.  This correspondence was received by **Chase** on July 12, 2010, however, **Chase** has never responded to this request.

98.  After this process, **Chase**'s scheme became apparent.  It was trying to use the Trial Period to do additional credit, income and NPV verifications that servicers are actually supposed to complete *before* contracting a Trial Period Plan.

99.  The only obligations on a consumer such as the Plaintiff after the Trial Period Plan Agreement is contracted as stated in the HAMP Servicer checklist: "For Modification Agreement to be executed— Borrowers must successfully complete trial period and return two signed Home Affordable Modification Agreements to the servicer."  Home Affordable Modification Program (HAMP):  Checklist for Getting Started and Participating in HAMP, February 22, 2010, Exhibit 8.

100.   Thus, contrary to **Chase**'s misstatement in its letter to Senator Warner, the "NPV" determination was not a condition for conversion of the Trial Period Plan Agreement to a permanent modification.

101.   By this point, **Chase** had been reporting to the Credit Reporting Agencies that her mortgage account had been delinquent since July 2009 and that she had been 90+ days late on her mortgage since December 2009 and for each month thereafter.  **Chase** was further reporting that she had a past due balance on her mortgage of over $15,000.00.  (*the Chase Reporting*).

---

was foreclosed as opposed to modified.

21

102.  The *Chase* Reporting was inaccurate.  The Plaintiff has never been 90+ days late on her mortgage at any time, nor is she over $15,000.00 delinquent.

103.  Plaintiff has disputed the *Chase* mortgage account on multiple occasions through the national consumer reporting agencies and most recently in June 2010.

104.  On or about June 10, 2010, *Equifax's* Results of Investigation mailed to the Plaintiff advised that the *Chase* mortgage account had been verified by the creditor and that additional information had been provided for the account.  This additional information was the account was now reporting as a collection account and that it was 180 days or more past due since April 2010.

105.  On or about June 11, 2010, *Experian's* Investigation Results mailed to the Plaintiff advised that the *Chase* mortgage account had been updated.  The Chase account was likewise reporting that it was 180 days or more past due since April 2010, that the account was $15,445.00 past due and that the recent balance on the loan was now $699,098 as of June 2010.

106.  On or about June 12, 2010, *Trans Union's* Investigation Results mailed to the Plaintiff advised that it was reporting new information for the *Chase* mortgage account.  The *Chase* mortgage account had been verified as 120 days past due, with a past due balance of $15,445.

107.  On information and belief, the Plaintiff alleges that *Chase* received, but ignored the Plaintiff's disputes and did refuse to correct and delete the inaccurate information regarding the derogatory account from the Plaintiff's credit files.

108.  Throughout the entire trial period, *Chase* failed to report the Plaintiff's account accurately and in the manner prescribed by the CDIA guidelines.  Her loan was current when it entered the plan and was to be reported current after she entered the plan.

109. *Chase* had actual knowledge of these inaccuracies and deliberately chose to cause the

reporting of the derogatory accounts.

110.    After one or more of the Plaintiff's disputes were forwarded by the credit bureaus to *Chase*, *Equifax, Experian* and *Trans Union* prepared and published to third parties multiple inaccurate consumer reports about Plaintiff that contained and republished the inaccurate derogatory *Chase* mortgage tradeline.

111.    Upon information and belief, Plaintiff alleges that on one or more occasions *Equifax, Experian* and *Trans Union* forwarded Plaintiff's dispute to *Chase*.  Upon information and belief, *Chase* was provided notice of Plaintiff's dispute and despite this notice, failed and refused to investigate and correct it's inaccurate reporting.

112.    Plaintiff received a Federal Form 1098 – Mortgage Interest Statement for tax year 2011 from *Chase* that stated that the Plaintiff had only paid the sum of $1,346.16 in interest for 2011.  This was false.

113.    On or about January 25, 2012 a *Chase* representative advised the Plaintiff in a phone call that any payments that she was making were being placed in an unidentified funds account and were not being credited as payments on her mortgage.

114.    Plaintiff has been regularly making mortgage payments to the Defendant. Nevertheless, Defendant has either refused such payments or refused to credit the payments to her account.

115.    In her previous dealings with *Chase*, the Defendant has represented to her then estranged, now ex-husband that if he signed and recorded a Quit Claim Deed to the Plaintiff, *Chase* would refinance or modify its loan.

116.    The ex-husband did so, *Chase* then refused to perform and, as it had agreed, to

23

remove him from its loan.

117.    As a result in the Plaintiff's divorce proceedings, the state court ordered the sale of the Plaintiff's home in order to obtain removal of the ex-husband from *Chase*'s loan.

118.    Upon such Order, the Plaintiff began in earnest to seek refinance of her mortgage through a different lender.   Accordingly, in early 2012 the Plaintiff made multiple mortgage applications.

119.    Each of the Plaintiff's prospective Lenders then required information about the Plaintiff's mortgage payment history with *Chase*.

120.    On or about March 6, 2012 Plaintiff's proposed Lender, Prime Lending obtained a Residential Merged Credit Report from Kroll Factual Data in which the *Chase* mortgage account was reporting as $17,586 past due by Equifax and Experian.  The account was also reporting that the Plaintiff had been over 90+ days late 8 times, 60 days late 2 times and 30 days late 1 time in the payment of her mortgage account.  The account further reported that the consumer disputed the account information and that a resolution was pending.

121.    The Plaintiff then asked Kroll to contact *Chase* directly, which it did.

122.    On or about April 3, 2012 during a conference call a *Chase* representative in Loss Mitigation advised the Plaintiff and a representative of Kroll Factual Data that the Plaintiff owed over $43,460.04 in past due fees on her mortgage, and that *Chase* had not applied any payments to her mortgage since 2009.

123.    This communication was not in Defendant's capacity as a credit reporting furnisher.

124.    On or about April 13, 2012 *Chase* forwarded Verification of Mortgage to the Plaintiff that stated that her mortgage account had been past due since February 1, 2010.

24

125.    Plaintiff has attempted with two other Lenders to obtain financing to purchase a home in Maryland; however, Plaintiff has been unable to obtain a pre-approval due to the *Chase* account.

126.    This credit reporting information of the *Chase* mortgage account was false, as the Plaintiff had been trying to obtain permanent modification of her *Chase* mortgage since March 2009. Plaintiff timely made each of the payments provided for in the Trial Period Contract Agreement due in August, September and October 2009. Plaintiff also made timely payments for October, November and December 2009 and February 2010 through the present.

127.    It is believed that *Chase* did not apply any of the Plaintiff's payments to reduce, even in part, the principal and interest on plaintiff's loan, but rather placed said payments in an escrow account or "unapplied funds" account.

128.    Plaintiff has been disputing the *Chase* mortgage account directly with *Chase* since September 2009 and through the credit reporting agencies as recently as early this year (2012), through confidential settlements reached with the credit reporting agencies in a separate action concerning its credit reporting of the Plaintiff's *Chase* mortgage account.

129.    Upon information and belief, Plaintiff alleges that on one or more occasions the national consumer reporting agencies forwarded Plaintiff's disputes to *Chase* since the filing of her previous lawsuit. Upon information and belief, *Chase* was provided lawful notice of Plaintiff's disputes and despite this notice, failed and refused to investigate and correct it's inaccurate reporting of the Plaintiff's mortgage account.

## COUNT ONE: BREACH OF CONTRACT FOR BREACH OF
## THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

130.    Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

131.    A covenant of good faith and fair dealing exists in every valid Virginia contract, including notes and deeds of trust pertaining to real property such as the note and deed of trust pertaining to Ms. Bourdelais' property. A breach of the covenant of good faith and fair dealing is a breach of the underlying contract.

132.    Chase failed to perform its duty of good faith and fair dealing with respect to Ms. Bourdelais by (1) falsely informing her that she had to be in default on her mortgage in order to be considered for a loan modification under HAMP; (2) falsely informing her that since she was current on her mortgage, she would have to miss a payment in order to qualify for HAMP; (3) inducing her into a HAMP loan modification application and Trial Payment Plan without disclosing that it would consider the reduced monthly payment to be a delinquency or default that would place the loan into arrears and would trigger foreclosure; (4) instead of applying the payments made under the TPP to reduce the principal and pay the interest and escrow on her mortgage, Chase put the payments into an escrow account; (5) despite telling the Plaintiff her application was complete, Chase sent her a denial notice stating that she had not timely provided required documents and thus her application was being denied as incomplete; (6) failing to abide by terms of the Note and Deed of Trust that govern the original loan; (7) failing to follow HAMP guidelines; (8) failing to properly safeguard and maintain important documents provided by Ms. Bourdelais; (9) continuing to perform additional NPV, credit and income verifications during the TPP; (10) despite requests from Ms. Bourdelais, Chase refused to provide her with NPV calculations; after inducing Ms. Bourdelais into a TPP, and

despite her compliance with all of Chase's conditions, Chase repeatedly sent acceleration notices to Ms. Bourdelais and reported her to the consumer reporting agencies as defaulted on her mortgage.

133.   Chase's breach of its duty to act in good faith and deal fairly with Ms. Bourdelais breached the Note and Deed of Trust.

134.   Because of its breach of the implied covenant of good faith and fair dealing, Chase is not entitled to exercise the remedy of foreclosure under the Deed of Trust.

135.   Ms. Bourdelais also suffered actual damages and is threatened with additional harm from Defendants' breach.  By making Trial Period Plan payments both during and after the three-month trial period, Ms. Bourdelais lost other remedies that would be available to her in order to save her home and prevent damage to her credit reputation.  For instance, she could have continued to make payments under the terms of the original note, enter into a repayment plan, restructure her debt under the bankruptcy code, sell her home or pursue other strategies.

136.   To the extent that actual damages will not fully and fairly compensate Ms. Bourdelais, she is entitled to specific performance and other appropriate injunctive relief.

137.   Ms. Bourdelais is entitled to actual damages, reinstatement of her mortgage, cessation and rescission of any foreclosure activity, and specific performance of a permanent modification.

### COUNT TWO: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. §1681s-2(b) (1)(A)

138.   Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

139.   On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, *Chase* violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(1)(A) by failing to fully and properly investigate the Plaintiff's disputes of the *Chase* reporting that were made through Equifax, Trans Union and Experian.

140.  As a result of this conduct, action and inaction of *Chase*, the Plaintiff suffered actual

damages including without limitation, by example only and as described herein on Plaintiff's behalf by counsel:  loss of employment, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

141.  *Chase's* conduct, actions and inactions were willful, rendering *Chase* liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, *Chase* was negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

142.  The Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys fees from *Chase* in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and §1681o.

### COUNT THREE: VIOLATION OF FAIR CREDIT REPORTING ACT
### 15 U.S.C. §1681s-2(b) (1)(B)

143. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

144.  On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, *Chase* violated the Fair Credit Reporting Act, 15 U.S.C. §1681s-2(1)(B) by failing to review all relevant information provided by the consumer reporting agencies upon the Plaintiff's dispute.

145.  As a result of this conduct, actions and inactions of *Chase* the Plaintiff suffered actual damages including without limitation, by example only and as described herein on Plaintiff's behalf by counsel:  loss of employment, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

146. *Chase's* conduct, actions and inactions were willful, rendering *Chase* liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, *Chase* was negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

147.  The Plaintiff is entitled to recover actual damages, statutory damages, costs and

attorneys fees from **Chase** in an amount to be determined by the Court pursuant to 15 U.S.C.

§1681n and §1681o.

## COUNT FOUR: VIOLATION OF FAIR CREDIT REPORTING ACT
## 15 U.S.C. §1681s-2(b) (1)(C) and (D)

148. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

149.  On one or more occasions within the two years prior to the filing of this suit, by

example only and without limitation, **Chase** violated the Fair Credit Reporting Act, 15 U.S.C.

§1681s-2b(1)(C) and (D) after her disputes through Equifax, Trans Union and Experian by

publishing the **Chase** within Plaintiff's credit file with Equifax and Experian without also

including a notation that this debt was disputed and by failing to correctly report results of an

accurate investigation to each other credit reporting agency.

150.  As a result of this conduct, actions and inactions of **Chase**, the Plaintiff suffered actual

damages including without limitation, by example only and as described herein on Plaintiff's behalf

by counsel:  loss of employment, damage to reputation, embarrassment, humiliation and other

emotional and mental distress.

151.  **Chase's** conduct, actions and inactions were willful, rendering **Chase** liable for

punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In

the alternative, **Chase** was negligent, entitling the Plaintiff to recover under 15 U.S.C. §1681o.

152.  The Plaintiff is entitled to recover actual damages, statutory damages, costs and

attorneys fees from **Chase** in an amount to be determined by the Court pursuant to 15 U.S.C.

§1681n and §1681o.

## COUNT FIVE: DEFAMATION

153. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

29

154.   In addition to its violations of the Fair Credit Reporting Act, **Chase** has made multiple false statements that are not governed by 15 U.S.C. §1681s-2. **Chase** published the false representation that Plaintiff was past due on her mortgage obligation to the credit reporting agencies and through the credit reporting agencies to all of Plaintiff's potential lenders on multiple occasions, and further on the following specific occasions;

For example on or about April 3, 2012 during a conference call a **Chase** representative in Loss Mitigation advised the Plaintiff and a representative of Kroll Factual Data that the Plaintiff owed over $43,460.04 in past due fees on her mortgage, and that **Chase** had not applied any payments to her mortgage since 2009.

155.   These defamations were made with legal malice and a willful intent to injure the plaintiff by placing derogatory information on her credit reports.  Chase had reason to know, both by virtue of information communicated to it by plaintiff and by its own records, that plaintiff had not refused to pay her obligation and that she was fully in compliance therewith. Further, Chase willfully adopted procedures that wholly ignored the demands of plaintiff, and other consumers generally, that inaccurate information should be removed from their credit files.

156.   As a result of Chase's conduct, actions and inaction, the plaintiff suffered various types of damage as set forth herein, including specifically, the loss of employment, loss of credit, the loss of the ability to purchase and benefit from a line of credit, and the mental and emotional pain, anguish, humiliation and embarrassment of credit denials.

157.   These defamations were malicious, willful, deliberate, intentional and/or with reckless disregard for the interests and rights of plaintiff, so as to justify an award of punitive damages against Chase in an amount to be determined by the Court.

**COUNT SIX: VIOLATION OF**
**REAL ESTATE SETTLEMENT PROCEDURES ACT**
**12 U.S.C. §2605(e)**

158. Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

159.  On one or more occasions within the two years prior to the filing of this suit, by example only and without limitation, the Plaintiff made multiple qualified written requests to Chase insisting that it process her *HAMP* application, correct inaccurate credit reporting and otherwise provide information regarding her loan.

160.    On nearly each occasion alleged in this Complaint, the Plaintiff's written communication was sent to the address at which she was instructed by Chase.

161.    On nearly each occasion in which the Plaintiff did make her qualified written requests, *Chase* violated the Real Estate Settlement Procedures Act, 12 U.S.C. §2605(e) by:

a.      Failing to timely or at all provide a written notice of receipt of inquiry;

b.      Failing to timely or at all to conduct an appropriate investigation of the Plaintiff's inquiry;

c.      Failing to timely or at all to provide the Plaintiff a true and correct written explanation or clarification; and

d.      Continuing to report information regarding allegedly overdue payments to the national credit bureaus.

162.    As a result of this conduct, actions and inactions of *Chase*, the Plaintiff suffered actual damages including without limitation, by example only and as described herein on Plaintiff's behalf by counsel:  loss of employment, damage to reputation, embarrassment, humiliation and other emotional and mental distress.

163. *Chase* is liable for actual damages in an amount to be determined by the Court

31

pursuant to 15 U.S.C. §2605(f).

164.     As alleged in the Complaint, Chase's conduct appears to be a pattern and practice of misconduct with many consumers.  It is certainly so with the numerous violations alleged as to the Plaintiff.  For each violation of 12 U.S.C. §2605(e), Chase is thus also liable to the Plaintiff for additional damages up to $1,000 per violation.

165.     The Plaintiff is entitled to recover costs and attorneys fees from **_Chase_** in an amount to be determined by the Court pursuant to 12 U.S.C. §2605(f)(3).

**WHEREFORE**, Plaintiff respectfully requests the following relief;

a. Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing,

b. Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiff;

c.     Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

e.  Award actual, statutory, and punitive damages as pled;

f. Award Plaintiff and her counsel attorney's fees and the costs of this action, including the fees and costs of experts;

g. Grant Plaintiff such other and further relief as this Court finds necessary and proper.

**TRIAL BY JURY IS DEMANDED**.

**MICHELLE BOURDELAIS,**

_____/s/_____

Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Blvd. Suite 1A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
E-mail:  lenbennett@cox.net

Susan M. Rotkis, Esq.
VSB #40693
Attorney for Plaintiff
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Blvd. Suite 1A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
E-mail:  srotkis@clalegal.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 15th day of August, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

David Neal Anthony
Troutman Sanders LLP
Troutman Sanders Bldg
1001 Haxall Point
PO Box 1122
Richmond, VA 23218-1122
E-mail:  david.anthony@troutmansanders.com

_____  /s/  _____
Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Blvd. Suite 1A
Newport News, VA 23601
(757) 930-3660 - Telephone
(757) 930-3662 – Facsimile
E-mail:  lenbennett@cox.net