**EXHIBIT 4**





AS OF JANUARY 8, 2010

## Supplemental Documentation—Frequently Asked Questions
## Home Affordable Modification Program

These frequently asked questions clarify the Supplemental Directives issued in connection with the Home Affordable Modification Program (HAMP). The questions and answers below should be reviewed by each servicer that has entered into a Servicer Participation Agreement (SPA) to participate in HAMP. These frequently asked questions constitute supplemental documentation that is included in, and shall be deemed part of, the HAMP Program Documentation described in Section 1 of the SPA.

## A. General

### Q1. Who should I contact with HAMP-related questions?

There are three options for HAMP-related servicer support, depending on the topic and whether the question pertains to a non-GSE, Fannie Mae, or Freddie Mac loan:

| For questions regarding: | Contact: |
|---|---|
| • **Non-GSE** Supplemental Directives, policy clarifications, and loan-level questions<br>• All reporting for the U.S. Treasury Department using HAMP Data Collector or the HAMP Reporting System | **HAMP Support Center:**<br>• support@hmpadmin.com<br>• 1-866-939-4469<br>• 9:00 a.m. to 9:00 p.m. ET, Monday through Friday |
| • **Fannie Mae** HAMP-related Servicing Guide Announcements, policy clarifications, or loan-level questions<br>• Fannie Mae reporting via HomeSaver Solutions® Network (HSSN) | **Fannie Mae Servicer Support Center:**<br>• servicing_solutions@fanniemae.com<br>• 1-888-FANNIE-5 (326-6435)<br>• 9:00 a.m. to 8:00 p.m. ET, Monday through Friday |
| • **Freddie Mac** HAMP-related Guide Bulletins, policy clarifications, and loan-level questions<br>• Freddie Mac reporting | **Freddie Mac Servicer Support:**<br>• 1-800-FREDDIE (373-3343)<br>• 8:00 a.m. to 8:00 p.m. ET, Monday through Friday business days |

## B. Borrower Eligibility

### Q2. Does the reason for the default have to be resolved before a borrower is eligible for a Home Affordable Modification?

Servicers should encourage borrowers to resolve the cause of a mortgage default, when appropriate, including providing referrals to HUD-approved housing counselors. However, a servicer cannot require a borrower to resolve the reason for the default as a condition of a Home Affordable Modification if the borrower meets HAMP eligibility requirements.

### Q3. How should borrowers who contact their servicer be handled with respect to HAMP if the servicer does not yet have the proper documents or is not yet equipped to evaluate the borrower's situation?

Participating servicers are required to validate the homeowner's eligibility for HAMP and capacity to pay. Participating servicers should begin the process of collecting the required documentation from the homeowner and the information necessary to establish an escrow account on non-escrowed loans. Based on the servicer's understanding of the homeowner's ability to pay, a servicer may place a homeowner on a forbearance plan pending its ability to execute a HAMP modification. Foreclosure actions (with the exception of those in Georgia, Hawaii, Missouri and Virginia), including initiation of new foreclosure actions, must be postponed for all borrowers that meet the minimum HAMP eligibility criteria.

### Q4. Can a loan be modified to a monthly mortgage payment ratio below 31 percent?

Servicers must apply the specified modification steps until the borrower's monthly mortgage payment ratio is reduced as close as possible to 31 percent, without going under 31 percent. A servicer may modify below 31 percent, subject to applicable contractual agreements, but incentive payments will be made based only on modification terms that reflect a 31 percent monthly mortgage payment ratio.

### Q5. Are home equity loans that are in first lien position eligible for modification under HAMP?

First lien home equity loans or lines of credit are eligible for modification under HAMP provided that the borrower and loan meet the basic HAMP eligibility criteria and (i) the servicer has the capability within its servicing system to clearly identify the loan as a first lien and (ii) the servicer has the ability to establish an escrow for the loan as required by Supplemental Directive 09-01. Servicers whose systems do not provide the required functionality are strongly encouraged to complete system upgrades that will allow modification of first lien home equity loans.

Any HAMP modification of a first lien home equity line of credit must result in a modified loan that is a fixed rate, fully amortizing loan that does not permit the borrower to draw any further amounts from the line of credit.

**Q6.** **REVISED** Can a servicer issue an offer under HAMP to a borrower whose mortgage is secured by a condominium or co-op unit if the servicer does not have current association fee information?

No. A servicer may not issue an offer under HAMP to a borrower whose mortgage is secured by a condominium or co-op unit if the servicer does not have the current association fee information. A component of the monthly mortgage payment ratio calculation is condo or co-op association fees. Current information on the amount of the association fees is necessary to accurately complete the monthly mortgage payment ratio calculation. The servicer can contact the borrower via telephone or email to obtain this information on a stated basis, complete the necessary monthly mortgage payment ratio calculation and then issue an offer under HAMP. Documents verifying the condo or co-op association fee information, such as a copy of the payment statement, a copy of a letter from the association or a copy of a collections letter indicating the fee amount, must be submitted by the borrower with other required documentation to determine HAMP eligibility.

**Q7.** If a borrower is delinquent and currently has a front end monthly mortgage payment ratio less than 31 percent, but capitalization of the delinquent amounts will cause the monthly mortgage payment ratio to exceed 31 percent, does the borrower qualify for HAMP?

No. The borrower will only qualify for HAMP if the verified income documentation confirms that the monthly mortgage payment ratio prior to the modification is greater than 31 percent and provided that the borrower is eligible for at least a 1/8th percent drop in the interest rate without the modified monthly mortgage payment ratio going below 31 percent.

**Q8.** Must servicers suspend foreclosure or not initiate foreclosure for all borrowers who are potentially eligible for HAMP?

To ensure that a borrower currently in foreclosure or at risk of foreclosure has the opportunity to apply for a HAMP modification, servicers should not proceed with a foreclosure sale until the borrower has been evaluated for the program. Additionally, servicers are strongly encouraged not to initiate foreclosure until a borrower has been evaluated and determined to be ineligible for the program or the borrower fails to respond to a HAMP offer that has been made by the servicer.

**Q9.** Is there any guidance on the imminent default analysis for the non-GSE program?

No additional guidance is being provided at this time with respect to determining whether a non-GSE loan is in imminent default under HAMP. However, with respect to non-GSE loans, servicers may follow the imminent default guidance provided by either GSE as long as that guidance conforms to the servicer's applicable contractual agreements and accounting standards. Servicers are reminded that for GSE loans, Supplemental Directive 09-01 requires servicers to follow the guidelines published by the particular GSE with respect to its loans.

**Q10.** **[NEW]** **Is a loan that secures a property owned by an *inter vivos* (living) revocable trust eligible for HAMP? What additional information or documentation, if any, should be obtained?**

A loan secured by a property owned by an *inter vivos* revocable trust is eligible for HAMP as long as the borrower (i) is a trustee of the trust, (ii) is a primary beneficiary of the trust, and (iii) occupies the property as his or her primary residence. The borrower must sign all HAMP-related documents in both an individual capacity and as trustee of the *inter vivos* revocable trust. For document requirements, servicers should refer to the "Other Pertinent Information" section of the document summary for the Home Affordable Modification Agreement (Fannie Mae/Freddie Mac Uniform Instrument, Form 3157) (the "Home Affordable Modification Agreement"), which is available at www.HMPadmin.com.

**Q11.** **[NEW]** **Are audited profit and loss (P&L) statements required when verifying income for HAMP?**

Audited P&L statements are NOT required for HAMP.

**Q12.** **[NEW]** **If a borrower makes the existing contractual monthly payment rather than the trial period payment during the trial period, should the servicer accept the higher payment from the borrower, depositing the difference in a suspense account?**

All payments made by the borrower must be applied in accordance with the existing loan documents. However, if the borrower makes a payment that is greater than his or her trial period payment, the servicer must review investor guidelines to determine if the borrower remains eligible for HAMP and, if making the contractual payment could jeopardize eligibility, notify the borrower in writing that making payments in excess of the trial period payment may impact the borrower's eligibility for a HAMP modification.

**Q13.** **[NEW]** **Can a borrower qualify for HAMP if the mortgage loan is currently in the redemption period after a foreclosure sale?**

The answer to this question is dependent on the amount of time remaining in the redemption period and other legal requirements of the state in which the property is located. When permissible under state law, the servicer should, on a case-by-case basis, seek prior investor approval prior to evaluating a borrower for HAMP during a redemption period.

**Q14.** **[NEW]** **If borrowers who are unrelated by marriage, civil union or similar domestic partnership under applicable law purchased their home together and one borrower has vacated the property, is the occupying co-borrower eligible to apply for HAMP?**

Yes, the occupying co-borrower may pursue HAMP if a quitclaim deed evidencing that the non-occupying co-borrower has relinquished all rights to the property has been recorded. Servicers must refer to investor guidance to determine which parties are required to sign the HAMP documents.

**Q15.** **NEW** Supplemental Directive 09-07 requires a servicer to use a recent credit report to verify that the property securing the mortgage loan is the borrower's primary residence. Is it acceptable to confirm the borrower's primary residence with other forms of documentation besides the credit report?

In all cases, a servicer must obtain a credit report to verify that the property securing the mortgage is the borrower's primary residence. If the credit report does not support the borrower's certification that the property securing the mortgage loan is the borrower's principal residence, the servicer must use other documentation, such as a federal income tax return or utility bill, to reconcile the inconsistency. This additional due diligence on the part of the servicer must be documented in the loan file/servicing system for compliance review purposes.

## C. De Minimis Test

**Q16.** For loans that are not fully amortizing products, what payment amount is used for the *de minimis* test?

In all cases, the monthly mortgage payment that was used to determine the borrower's eligibility (adjusted as applicable to include property taxes, hazard insurance, flood insurance, condominium association fees, and homeowners' association fees) should be compared to the borrower's monthly mortgage payment under HAMP (with the same adjustments). Therefore, except as noted in the next sentence, the monthly mortgage payment used to determine eligibility for loans that are not fully amortizing would not include full amortization of principal. However, if, at the time eligibility is being determined, the interest rate will reset within the next 120 days, non-GSE servicers are reminded that they should use "the greater of (i) the borrower's current scheduled monthly mortgage payment or (ii) a fully amortizing monthly mortgage payment based on the note reset rate using the index value as of the date of the evaluation" when determining both eligibility and the outcome of the *de minimis* test.

## D. Documents

**Q17.** Are there separate Servicer Participation Agreements (SPA) for Fannie Mae, Freddie Mac, and non-GSE loans?

The SPA and related documentation must be executed by servicers for non-GSE loans in order to receive Treasury-funded incentives and compensation. Servicers are not required to execute an SPA for GSE loans, since both Fannie Mae and Freddie Mac have made the program mandatory as detailed in their respective Announcements and Bulletins.

**Q18.** What entity should sign the SPA – the servicing entity, a holding company (if applicable), or the servicer's parent? Is there any guidance available on how master servicers or subservicers would participate in the non-GSE program?

The entity that has the direct contractual obligation to the investor to perform the servicing functions is the entity that will formally elect to participate in the non-GSE program by signing the SPA. This entity will sign the SPA regardless of whether (i) it has engaged one or more subservicers to perform some or all of the servicing functions on its behalf or (ii) it is subject to oversight by a master servicer that does not have a direct contractual obligation to the investor to perform the servicing functions. If the entity that signed the SPA sub-contracts out any portion of its responsibilities as a servicer to another party, the entity that signed the SPA will be liable for the acts and omissions of the sub-contracted party under the SPA.

In addition, the parent company of a servicing entity that has the direct contractual obligation to the investor to perform the servicing functions may alternatively sign the SPA on behalf of itself (i.e., the parent) and the contractually obligated servicing entity, as well as any other servicing subsidiaries that the parent specifies.

**Q19. If a servicer that has signed a SPA transfers mortgage loans, or servicing rights relating to mortgage loans, subject to the SPA, is the transferee servicer required to assume the transferor servicer's obligations under the SPA with respect to those mortgage loans?**

No. The transferee servicer may, but is not required to, assume the transferor servicer's obligations under the SPA with respect to the applicable mortgage loans. Unless the obligations are assumed by the transferee servicer, the transferor servicer may not use a transfer to circumvent its existing obligations under the SPA (i.e., remitting HAMP incentive payments earned on modified loans, modifying loans that successfully complete HAMP trial periods, evaluating borrowers that are 60 or more days delinquent for HAMP eligibility). In addition, if the transferee servicer has signed its own SPA, the mortgage loans involved in the transfer will become subject to the transferee servicer's SPA.

**Q20. Are there separate modification documents for GSE and non-GSE loans?**

A single set of model modification documents has been provided for all loans regardless of investor. However, the documents may need to be customized for certain situations that are unique to a particular investor's loan program.

**Q21. Are state-specific documents required on HAMP modifications? For example, are state-specific balloon riders required when applicable?**

The servicer must revise the HAMP documents as necessary to comply with federal, state, and local laws. For example, in the event that the HAMP modification results in principal forbearance, servicers are obligated to modify the uniform instrument to comply with laws and regulations governing balloon disclosures.

For all mortgage loans that are modified pursuant to HAMP, the servicer must follow investor guidance with respect to ensuring that the modified mortgage loan retains its first-lien position and is fully enforceable.

**Q22. REVISED If the borrower files for bankruptcy protection during the trial period, is the trial period plan canceled automatically or is a servicer required to continue to work with the borrower?**

Borrowers who file bankruptcy during the trial period remain eligible for a HAMP modification provided they make all of the required payments in a timely fashion, are otherwise in compliance with the trial period plan and the certifications set forth in the Hardship Affidavit or the MHA Request for Modification and Affidavit, as applicable, remain true and correct. The servicer and its bankruptcy counsel must work with the borrower and the borrower's bankruptcy counsel to obtain any required court approvals of the modification. A borrower actively involved in a bankruptcy proceeding prior to being placed in HAMP is eligible for HAMP at the servicer's discretion. If a servicer provides an offer under HAMP to a borrower that is involved in an active bankruptcy case,

the servicer must work with the borrower or borrower's counsel to obtain all necessary approvals from the bankruptcy court.

**Q23.** REVISED **How should servicers address loan documents that did not include standard escrow provisions?**

Servicers must replace Section 4.D. of the Home Affordable Modification Agreement with industry standard escrow account provisions that are comparable to the escrow account provisions found in the Fannie Mae/Freddie Mac uniform instruments.

In addition, if the servicer uses a Home Affordable Modification Trial Period Plan (Fannie Mae/Freddie Mac Uniform Instrument, Form 3156) (the "Trial Period Plan"), the servicer must insert the following language at the end of section 4.C. of the Trial Period Plan:

"Unless the Lender determines that an Escrow Account may not be established in connection with the mortgage loan under applicable law, this Plan constitutes notice that the Lender's waiver as to payment of Escrow Items, if any, has been revoked, and I have been advised of the amount needed to fund my Escrow Account. If the Loan Documents do not currently have Escrow Account provisions comparable to those in the Fannie Mae/Freddie Mac Uniform Security Instruments, such Escrow Account provisions comparable to the Escrow Account provisions in the Fannie Mae/Freddie Mac Uniform Instrument for the state in which the property is located, shall be added in the Modification Agreement."

**Q24.** REVISED **Are servicers permitted to insert conditional language in the Trial Period Plan and the Home Affordable Modification Agreement to avoid having to review each set of base loan documents to determine if they contain prepayment or assumption provisions or, in order to retain first lien position, require subordination agreements and/or title policy endorsements?**

The Trial Period Plan and the Home Affordable Modification Agreement currently available on www.HMPadmin.com have been updated to include the necessary conditional language.

**Q25.** REVISED **Must all prepayment penalties be waived in connection with a HAMP modification, or only prepayment penalties associated with borrower "pay for performance" principal balance reduction payments?**

Except as provided below in Q26, no prepayment penalties may be assessed in connection with modifications under HAMP. Therefore, if any provision in the note or in any addendum or amendment to the note allows for the assessment of a penalty for full or partial prepayment of the note, such provision must be waived. Conditional language to implement this waiver is included in the Home Affordable Modification Agreement.

**Q26.** REVISED **Is a participating servicer required to modify loans that are eligible for HAMP if the servicer is subject to a pooling and servicing agreement or similar servicing contract ("PSA") that requires payment of a material sum to investors if any applicable prepayment penalties are waived?**

Yes, such loans must be modified if they are eligible for HAMP modifications, and servicers must use reasonable efforts to eliminate the PSA provision requiring payment by the servicer if the

prepayment penalty is waived. However, if the servicer is unable to eliminate the PSA provision, the servicer is not required to waive the prepayment penalty as part of the HAMP modification, provided that the prepayment penalty must be waived with respect to any borrower "pay for performance" principal balance reduction payments that are applied to the borrower's mortgage loan. In such a case, servicers should replace Section 4.I. of the Home Affordable Modification Agreement with the following language:

> "That, as of the Modification Effective Date, any provision in the Note, as amended, for the assessment of a penalty for full or partial prepayment of the Note must be waived with respect to any borrower "pay for performance" principal balance reduction payments that are applied to the Loan."

**Q27.** REVISED **If the standard modification waterfall requires principal forbearance, should the Home Affordable Modification Agreement be amended to reflect the principal forbearance amount?**

The Home Affordable Modification Agreement must be revised to reflect the principal forbearance amount. The exact modification language can be obtained from the document summary for the Home Affordable Modification Agreement, available at www.HMPadmin.com.

**Q28.If the borrower had no obligation under the Loan Documents to remit escrow items or the lender waived the requirement to pay escrow items prior to entering into the trial period (the terms of which revoked that waiver), must the borrower continue to remit escrow items with the monthly payment if the borrower fails the trial period?**

Once the escrow account is established, the borrower must continue to make monthly escrow payments. However, upon a borrower's failure of the trial period, a servicer may waive the requirement to make monthly escrow payments, subject to any limitations imposed by applicable law and any investor or other contractual requirements (e.g., servicer obligations to advance tax, insurance and other third party payments to protect the investor's first lien position).

## E. Escrow

**Q29.Can escrow payment estimates be used to determine payments during the trial period to avoid delays in processing?**

Servicers may perform an escrow analysis based on estimates prior to extending a HAMP offer. However, if a servicer estimates the escrow payments for the HAMP offer, the servicer is not permitted to use national averages in the estimate calculations. Prior to determining the borrower's eligibility for HAMP based on documentation, servicers must complete an escrow analysis to determine the exact escrow payments.

**Q30.How should servicers treat escrow shortages?**

In the event the initial escrow analysis identifies an escrow shortage – a deficiency in the escrow deposits needed to pay all future tax and insurance payments – the servicer must take steps to eliminate the shortage. Any actions taken by the servicer to eliminate the escrow shortage must be in compliance with applicable laws, rules, and regulations, including, but not limited to, the Real Estate Settlement Procedures Act.

**Q31.** [NEW] **If a borrower has successfully completed the trial period plan and the servicer is preparing the Home Affordable Modification Agreement, should the servicer have the borrower execute a note for any escrow advance? Should the servicer provide a Truth-in-Lending (TIL) statement for this loan?**

The servicer should not have the borrower execute a note for any escrow advance. Instead, the servicer should capitalize any escrow advance that has been or will be paid to a third party before the modification agreement's effective date as outlined in Supplemental Directive 09-01. If capitalization is prohibited by applicable law, the servicer should have the borrower repay the advance in accordance with investor guidelines, the underlying security instrument and all applicable laws, rules and regulations including, but not limited to, RESPA and TILA.

## F. Principal Forbearance

**Q32.** **If a borrower with principal forbearance makes a substantial principal curtailment that is greater than or equal to the interest-bearing unpaid principal balance (UPB), should the curtailment be applied to the interest bearing principal or the principal forbearance portion?**

The curtailment should be applied to the principal forbearance portion. This policy eliminates the possibility of a curtailment paying off (and satisfying) the interest-bearing portion of the UPB (the entire loan would become due and payable at that point), thereby forcing the borrower to pay off the principal forbearance portion of the loan balance. In those instances, to avoid that negative result, the curtailment must be applied to the principal forbearance amount. Any remaining funds would be applied to the interest-bearing UPB.

**Q33.** [REVISED] **Does the earlier FDIC guidance on accounting treatment of principal forbearance apply under HAMP?**

Yes. For loans within securitizations, servicers, securities administrators and other transaction parties should treat HAMP principal forbearance amounts as realized losses as of the applicable loan modification dates under any applicable securitization pooling or trust agreement. The only exception to that principle is that servicers and securities administrators are permitted not to treat HAMP principal forbearance amounts as realized losses if, and only if, (i) the applicable securitization pooling or trust agreement specifically addresses principal forbearance in the HAMP context (i.e., it includes the permanent forgiveness of interest and postponement of principal repayment for a long period, as described below) and (ii) such agreement explicitly and affirmatively directs that such forborne principal not be treated as a realized loss.

For the avoidance of doubt, "principal forbearance" in the context of HAMP is non-interest bearing and non-amortizing. Securitization pooling or trust agreements often use the term "principal forbearance" in a context which only requires delaying of the date on which certain payments of principal are due for short periods; interest typically continues to accrue and is required to be capitalized. For HAMP, not only must principal forbearance delay the date in which such forborne principal is due to maturity sale or payoff, but no interest may accrue on such forborne amounts.

## G. HUD Counseling

### Q34. Who pays for the HUD counseling?

There is no charge to either borrowers or servicers for HUD-approved counseling (borrowers whose back-end debt-to-income ratio is equal to or greater than 55% must represent in writing in the HAMP documents that they will obtain such counseling). Servicers may, at their discretion, use a portion of the servicer incentive compensation to compensate counselors for counseling services provided in conjunction with HAMP.

### Q35. If a borrower has recently completed HUD-approved debt counseling, do they still need to work with a counselor?

Borrowers with back-end debt-to-income ratios of 55 percent or more must agree in writing to obtain HUD-approved counseling as a condition of receiving a HAMP modification, even if they recently completed counseling.

## H. Income Verification

### Q36. **REVISED** Why must the borrower submit an IRS Form 4506-T?

Servicers should refer to the guidance provided in Supplemental Directive 09-07 with respect to IRS Form 4506-T. Servicers should also note that on October 21, 2009, the IRS introduced Form 4506T-EZ. Form 4506T-EZ is a permissible substitute under HAMP for Form 4506-T for borrowers who filed a Form 1040 series on a calendar-year basis.

### Q37. If a borrower submits unsigned tax returns, but provides evidence the returns were electronically filed, does evidence of the electronic filing satisfy the requirement for "signed tax returns"? If a borrower submits unsigned tax returns, must a servicer file the Form 4506-T or Form 4506T-EZ, as applicable, or may they return the tax returns to the homeowner for signature?

Evidence of an electronically filed tax return satisfies the signed tax return requirement. If the borrower submits an unsigned tax return without evidence of electronic filing, the servicer may either file the Form 4506-T or Form 4506T-EZ, as applicable, or return the tax return to the homeowner for signature. Upon execution, the borrower should return the "signed" return to the servicer.

### Q38. **REVISED** Is the borrower eligible for HAMP if he or she is not a current tax filer?

Yes. Only the borrower's most recent tax return needs to be obtained. If the tax return for the most recent tax year is not available, the servicer must process the borrower's signed Form 4506-T to confirm that the borrower did not file a tax return for that year.

### Q39. **REVISED** Is the borrower eligible for HAMP if he or she is not required to file a tax return?

Yes. Such a borrower must document why he or she does not need to file a tax return. The servicer must review and approve this rationale. A borrower is not eligible for HAMP if the borrower was required to file a tax return but failed to do so.

**Q40.** **If the borrower can provide two pay stubs that show current earnings used for qualifying purposes under HAMP, can the servicer use only that information and not require YTD earnings?**

No. Documentation of YTD earnings is a requirement of HAMP. Current earnings should be used to qualify the borrower. YTD earnings can be used to substantiate additional income such as bonuses and overtime.

**Q41.** REVISED **Could you please clarify the intent behind "third party documents" related to self-employed income?**

As provided in Supplemental Directive 09-07, third party documents are no longer required for self-employed borrowers.

**Q42.** **Can income of a household member not on the original note be used in the income calculations to qualify for the modification? If so, would it require that the person be added to the Note for the modification?**

A borrower has the option of disclosing a household member's income (where the household member is not included on the Note). Servicers should include non-borrower household income in monthly gross income if it is voluntarily provided by the borrower and if there is documentary evidence that the income has been, and reasonably can continue to be, relied upon to support the mortgage payment. All non-borrower household income included in monthly gross income must be documented and verified by the servicer using the same standards for verifying a borrower's income. The borrower may elect to add a new borrower to the note, but it is not a requirement in order to include the household member's income in the Home Affordable Modification evaluation.

**Q43.** **If income from other non-borrower household members is considered under HAMP, should a servicer also consider expenses for the other household members?**

A servicer should not consider expenses of non-borrower household members but may consider the percentage of his or her income that the non-borrower routinely contributes to the household.

**Q44.** **What action should the servicer take if the tax returns do not align with the paystubs provided?**

The servicer should ask the homeowner to explain material differences between tax returns and income documentation, and document such differences in the servicing system. If the verified documentation reasonably indicates that a borrower is committing fraud, the servicer should not extend the modification.

**Q45.** **For a loan in foreclosure, may a servicer require the homeowner to make the initial trial period payment in certified funds? May a servicer require certified funds on subsequent trial period payments?**

Servicers should continue to follow their current practices, subject to applicable law and the mortgage documents, as it relates to requiring borrowers to make payments using certified funds.

Servicers may not impose any stricter standard for payments due under HAMP than are applied in the servicer's other loss mitigation programs.

# I. Net Present Value (NPV) Model

### Q46. What is the NPV model and what is it used for?

The NPV model determines the NPV outcome (positive or negative) for a given modification. A positive NPV occurs where the discounted value of expected cash flows for the modified loan is higher than the discounted value of expected cash flows for the unmodified loan. The NPV model software tool resides on the servicer Web portal (www.HMPadmin.com), and is available to all participating servicers of both GSE and non-GSE mortgage loans eligible for a Home Affordable Modification.

### Q47. Is there a different NPV model for non-GSE and GSE loans?

The same basic NPV model will be used by each servicer for both non-GSE and GSE loans. However, as discussed below, large servicers of non-GSE loans will be able to customize the model based on the unique performance of their own portfolios. Additionally, with respect to certain assumptions such as discount rate, servicers may use different values for non-GSE and GSE loans, subject to the respective GSE's guidelines.

### Q48. Will every servicer be required to use the same discount rate in calculating NPV?

For GSE loans, servicers must follow the respective GSE guidance with respect to the discount rate. For non-GSE loans, servicers have the option of using the same discount rate for all loans or choosing one discount rate for loans they service for themselves and a different discount rate for loans serviced for all third party investors. The discount rate applied to loans serviced on behalf of third party investors must be at least as high as the discount rate applied to a servicer's held portfolio, but in no event higher than the maximum rate permitted under the HAMP. Program guidelines establish a base discount rate for non-GSE loans equal to the Freddie Mac Primary Mortgage Market Survey (PMMS) rate for 30-year fixed-rate conforming loans. Servicers of non-GSE loans may add a premium of up to 250 basis points to this rate.

### Q49. REVISED Can the HAMP modification be pursued if the NPV result is negative?

For non-GSE loans, a servicer is not required to offer the HAMP modification on a loan where the NPV result is negative, but it may do so at its discretion in accordance with investor guidelines. If the NPV is negative and the servicer chooses to modify the loan, any principal forbearance amount may not reduce the interest-bearing principal to less than 100 percent of the mark-to-market loan-to-value (LTV) ratio. For GSE loans, servicers should refer to the applicable GSE guidelines as it relates to NPV results and HAMP eligibility.

### Q50. Will servicers be able to build the NPV model into their platform/system? Can they customize the NPV Calculator?

Yes. Detailed business and technology requirements for servicers wishing to install the NPV Calculator on their own systems are forthcoming and will be posted on www.HMPadmin.com. The most recent Net Present Value Model Documentation can be obtained at www.HMPadmin.com.

Servicers having at least a $40 billion servicing book will have the option to create a version of the NPV model that uses a set of cure rates and redefault rates estimated based on the experience of their own portfolios. The default model must take into consideration, if feasible, current LTV, current monthly mortgage payment, current credit score, delinquency status, and other loan or borrower attributes. Customized versions of the NPV model must utilize the base NPV model values for variables such as home price projections and foreclosure and REO timelines and costs. These values are posted on www.HMPadmin.com, and will be periodically updated. Any servicer electing to either build the NPV model into their platform/system and/or create a customized version of the NPV model must first successfully pass an output test, as to ensure that the servicer NPV model outputs are consistent with the base Treasury model. Servicers may not begin using a recoded or customized model without first obtaining an acceptable output test.

GSE servicers must consult each GSE with respect to the loans it services on behalf of that GSE before building the NPV model into their own platform/system or customizing the NPV Calculator.

### Q51. Will Freddie Mac, in its capacity as Compliance Agent for the Treasury, monitor implementation or customization of the NPV model?

Yes. Servicers electing either to implement the NPV model on their own systems or, where eligible, to create a customized version must first successfully pass an NPV output test to ensure that the servicer's NPV model outputs are consistent with those of the Base NPV Model v3.0.

Servicers who plan to begin using their own NPV Model v3.0 by September 1, 2009 are required to conduct and pass the NPV output test before that date. Servicers planning to implement or customize the NPV model *after* September 1, 2009 must pass an output test before they begin using that model.

The MHA Compliance Agent (Freddie Mac) will administer and evaluate the results of all servicer NPV output tests and provide the necessary clearance for servicers to begin using their own NPV models. The test will involve running a dataset of sample modifications against the servicer's NPV model. To pass the test, the servicer NPV model results for the entire dataset of sample modifications must be consistent with the corresponding base NPV model results, within a defined threshold of acceptable variance. Additional instructions regarding the NPV output test will be provided to servicers upon request. Please e-mail Dane D'Alessandro, Director, Program Management, MHA Compliance at: dane_d'alessandro@mhacompliance.com.

Subsequent to the test, servicers electing to use a customized version of the NPV model will be asked to provide documentation on methodology and key assumptions, as well as evidence that the servicer has instituted adequate controls and governance procedures with respect to the model.

NPV compliance testing will be conducted on an ongoing basis for the life of the HAMP program, and will be triggered both by changes to the base NPV model and by servicer-driven changes, such as migration to new systems, subsequent decisions to use servicer-specific default rates (where permitted) or to change those rates, and other related factors.

Servicers of Fannie Mae and Freddie Mac loans must follow the respective GSE's guidance regarding building the NPV model into their own platform/system or customizing the NPV model.

**Q52. How soon after release of a new version of the Making Home Affordable NPV model or after signing a Servicer Participation Agreement must a servicer begin to use the new base NPV model?**

Participating and new servicers will have a grace period to implement each new version of the Making Home Affordable (MHA) Net Present Value Base Model. The grace period for each new version will be set forth in the applicable NPV release documentation. In addition, the release documentation will provide guidance as to which NPV model version servicers should use during the grace period. After the grace period, servicers must use either the most recent version of the base MHA Net Present Value Model or a customized version that meets the requirements for customization outlined in the model documentation.

**Q53. Will mortgage insurance (MI) be considered in the NPV model?**

Yes. MI is considered in calculating the net present value of both the modified and unmodified loan. MI payments reduce investor losses in the event of a default for both of these scenarios. In addition, partial MI claims can be entered to increase the value of the modification to the investor.

**Q54. I initially tested a borrower under an earlier NPV model (e.g., Version 1.5) and he passed. I received the borrower's income documentation after the next major model version was released (e.g., version 2.0). Should I retest the borrower based on verified income using the current version of the NPV model?**

No. Servicers should test borrowers using the same major NPV model version each time the borrower is evaluated. All previous major versions of the NPV model are available on www.HMPadmin.com so that borrowers can be tested using the same major NPV model version for each evaluation.

**Q55. Can servicers choose the NPV model version used to test a specific borrower?**

No. New applicants to HAMP should be tested using the latest available NPV model version, and retests should use the same major model version as the initial test.

**Q56. I tested a borrower using the NPV model and he passed. Since then, I have received the borrower's income documentation. When I retest the borrower based on verified income, which NPV inputs should I hold constant and which NPV inputs should I update?**

The only NPV inputs that should be updated when the borrower is retested are those that were incorrect on the date of the initial NPV evaluation and since have been corrected based on the borrower's income documentation. Inputs that have changed in the interim but were correct on the date of the initial NPV evaluation should be held constant. Elements that change based on documentation are likely to be limited to borrower-reported information, such as income, homeowner association fees, and monthly tax payments. The terms of the modification – the interest rate reduction, term extension, and forbearance amount – also may change as the borrower-reported inputs are adjusted. In the portal version of the NPV model servicers should not change the "Data Collection Date" or the associated UPB and remaining term information. This information should be reported for the retest as it was in the initial NPV evaluation.

## J. Reporting Requirements

**Q57. When will reporting requirements, including the key data points, be available for servicers? What type of reporting format/medium will be required?**

Servicers must begin providing loan level data to Fannie Mae, the program administrator, when a HAMP loan enters a trial period. Details on the required loan level data for these reporting requirements are provided in the "HAMP Data Dictionary" available at www.HMPadmin.com.

**Q58. What date should be reported by the servicer for the Interest Rate Lock Date for Modification in the trial period set up file and in the loan set up file?**

The Interest Rate Lock Date for Modification is the date that the Interest Rate Cap for a modified mortgage loan is determined. For trial set up reporting, the servicer should report the date that it selected the Freddie Mac Weekly Primary Mortgage Market Survey (PMMS) Rate used to determine eligibility for HAMP when establishing the interest rate terms in the standard waterfall process for the trial period payment under the trial period plan. For loan set up reporting, the servicer should report the date that it selected the Freddie Mac Weekly PMMS Rate used to establish the interest rate terms in the standard waterfall process for the modification payment under the Modification Agreement. As specified in Supplemental Directive 09-01, the Freddie Mac Weekly PMMS Rate used for the modification payment should be the rate, rounded to the nearest 0.125 percent, in effect as of the date that the Modification Agreement is prepared.

**Q59. If the servicer does not have the property condition from an appraisal or BPO, what should the servicer enter in the "property condition" field in IR2?**

The servicer should enter "3" (Fair) when they don't have a property condition from an appraisal or a BPO, provided the property meets HAMP eligibility requirements. Servicers must enter "5" if the property is condemned. When servicers enter "3" because they don't have a property condition from an appraisal or a BPO: (i) the "property condition" field in IR2 may not be relied on by the servicer as a justification or presumption that the loan qualifies for HAMP and that any subsequent payout based on the information in IR2 does not constitute a waiver on the part of the investor and/or Treasury who reserves all rights to seek reimbursement of an improper payout or repurchase of the loan in the event the property does not meet HAMP eligibility requirements; and (ii) the "property condition" field in IR2 may not be relied on by the investor as grounds for repurchase of the loan due to a breach of a representation and warranty related to the property condition.

**Q60. [NEW] What should a servicer do if its servicing system will not report to credit bureaus based on the due date of the trial period payment as stated in the Trial Period Plan cover letter, but instead reports based on the contractual due date? If the servicer cannot follow the process, can it delete the specific language in the cover letter regarding credit reporting?**

As outlined in Supplemental Directive 09-01, if a borrower is current prior to entering the trial period, servicers are required to report to the credit bureaus that the borrower is current but on a modified payment if the borrower makes timely trial period payments by the 30th day of each trial period. If the servicer's servicing system will not allow them to report in this manner, servicers may edit the Trial Period Plan cover letter to accurately describe the servicer's practice related to credit bureau

reporting. Note: The new Trial Period Plan Notice does not contain detailed language related to credit bureau reporting practices.

**Q61.** **[NEW]** **The IRS Form 1098 does not contain the UPB for the applicable loan. In the case of a loan with a principal forbearance, would it be an accurate assumption that a notation is not necessary on the 1098 to remind the borrower of the principal forbearance?**

Yes.

**Q62.** **[NEW]** **If the servicer utilizes an IRS-compliant Annual Borrower Statement that includes the UPB of the modified loan as a substitute 1098 and the loan has principal forbearance, is it necessary to state the principal forbearance amount on the statement?**

Yes. Any borrower statement that includes the unpaid principal balance of the loan must include the principal forbearance amount, if applicable.

## K. Trial Period

**Q63.** **[REVISED]** **Must foreclosure be suspended during the trial period?**

Except in "foreclosure restart states" as described in Q65 below, any foreclosure sale must be suspended and no new foreclosure action may be initiated during the trial period. Foreclosure actions may not be initiated or restarted until the borrower has failed the trial period and the borrower has been considered and found ineligible for other available foreclosure prevention options.

**Q64.** **[REVISED]** **What is success or failure under a trial period plan?**

The trial period plan is considered to be successful if the borrower has made all of the trial period plan payments no later than the last business day of the month in which the last trial period plan payment is due, the borrower has provided all required documentation, the borrower has complied with all other requirements of the trial period plan and the certifications set forth in the Hardship Affidavit or the MHA Request for Modification and Affidavit, as applicable, remain true and correct. If the servicer has not received all trial period plan payments or required documentation by this deadline or determines the borrower has not otherwise complied with the trial period plan, the borrower has failed the trial period and is not eligible for a permanent loan modification under HAMP. The servicer must consider the borrower for other foreclosure prevention alternatives, including pre-foreclosure sales and deeds in lieu of foreclosure, as appropriate.

**Q65.** **What rules apply to loans that were in active foreclosure in foreclosure restart states prior to initiation of the trial period plan? Will borrowers be considered to have failed the trial period plan if they are not current at the time the foreclosure sale is scheduled? How could such borrowers be current if foreclosure was already in process?**

Due to unique foreclosure law requirements in Georgia, Hawaii, Missouri, and Virginia, borrowers in these states who were in active foreclosure prior to executing a trial period plan will be considered to have failed the trial period plan and servicers may proceed with the foreclosure if either (a) the

servicer determines that the borrower made a misrepresentation under the trial period plan or (b) the borrower has not made all required trial period payments through the end of the month preceding the month in which the foreclosure sale is scheduled to occur.

**Q66. When a borrower is placed in a trial period plan, does the loan information need to be changed on the servicer's system and the investor's system to reflect the trial period terms?**

No, scheduled loan terms in servicing systems should not be modified during the trial period. However, servicers must follow the requirements for reporting to the credit reporting agencies during the trial period as set forth in Supplemental Directive 09-01 and discussed below in Q67.

**Q67. How should borrower payments be reported to credit reporting agencies during the trial period?**

Servicers should continue to report a "full file" status report to the four major credit reporting agencies while evaluating a borrower for program eligibility and during the trial period plan. If a borrower is current when they enter the trial period, the servicer should report the borrower current but on a modified payment if the borrower makes timely payments by the last business day of each trial period month at the modified amount during the trial period. If a borrower is delinquent when they enter the trial period, the servicer should continue to report in such a manner that accurately reflects the borrower's delinquency and workout status following usual and customary reporting standards.

In both cases the servicer should report the modification when it becomes final.

**Q68. REVISED If the borrower fails during the trial period, can he or she be provided with another offer under HAMP?**

Deleted. Refer to Q71.

**Q69. REVISED If the borrower makes the first trial period payment before the servicer prepares the Trial Period Plan, and the borrower never returns a signed Trial Period Plan, can he or she be provided with another offer under HAMP?**

Deleted. Refer to Q71.

**Q70. REVISED If the servicer prepared a Trial Period Plan based on the borrower's stated income information and, upon receipt of the income documentation, discovers that the original Trial Period Plan was out of tolerance, can the borrower be provided with another offer under HAMP?**

Deleted. Refer to Q71.

**Q71.** REVISED Is a borrower who has received a HAMP offer eligible for a subsequent HAMP offer? When is a servicer's SPA obligation to offer a borrower a HAMP modification considered satisfied?

A borrower who has a received a HAMP offer is ineligible for a subsequent HAMP offer, and the servicer's SPA obligation to offer the borrower a HAMP modification is considered satisfied, in the following circumstances:

- the borrower received a HAMP modification and lost good standing, or

- the borrower received a HAMP offer and made the first payment under trial period plan, but did not (i) make all required payments by the end of the trial period, or (ii) provide all required documents by the end of the trial period.

A borrower may seek reconsideration for a HAMP modification and the servicer is obligated to consider the borrower's request under the SPA, in the following circumstances:

- the borrower was found ineligible, either for a trial period plan or during the trial period plan, but circumstances such as income have changed sufficiently to impact the previous determination, or

- the borrower received a HAMP offer, but did not make the first trial period payment by the end of the month in which it was due.

**Q72.** REVISED Can the borrower accelerate his or her modification effective date by making his or her trial period payments earlier than scheduled?

No. Although the borrower may make scheduled payments earlier than expected, under HAMP, the payments may not result in acceleration of the modification effective date. There is no variation to this rule.

## L. Valuation

**Q73.** REVISED Why is an appraisal, broker price opinion (BPO), or automated valuation model (AVM) generated property valuation necessary and when does such a valuation become stale?

The appraisal, BPO, or AVM-generated property valuation is an input to the NPV calculator. Pursuant to Supplemental Directive 09-07, the valuation must be less than 90 days old on the date the servicer first evaluates the borrower for HAMP eligibility using the NPV model. The information will remain valid for the duration of the trial period and does not need to be updated for any subsequent NPV evaluation.

**Q74. What is considered a reliable confidence score for an AVM?**

Servicers relying on their internal AVM should establish reasonable confidence scores. Confidence scores that are deemed reasonable by bank examiners are also considered reasonable for purposes of this program. For GSE AVMs, each GSE will communicate guidance on the permissibility to use internal AVMs and reasonable confidence scores.

**Q75.** If a broker price opinion (BPO) is utilized, will an exterior inspection be sufficient or is an interior/exterior inspection with photos required?

Where BPOs are utilized, exterior-only inspections are sufficient.

## M. Verification

**Q76.** If one of the borrowers on the loan is non-responsive (will not supply income documentation and will not sign a Home Affordable Modification Agreement), can the HAMP modification proceed with the remaining borrower who is residing in the household, as long as the HAMP modification does not have to be recorded?

Unless a borrower or co-borrower is deceased or a borrower and a co-borrower are divorced, all parties who signed the original loan documents or their duly authorized representative(s) must execute the HAMP documents. If a borrower and a co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property is not required to execute the HAMP documents. Servicers may evaluate requests on a case-by-case basis when the borrower is unable to sign due to circumstances such as mental incapacity, military deployment, etc.

**Q77. [NEW]** Can HAMP be considered for a borrower that is temporarily displaced (e.g., incarceration, temporary foreign service assignment, military service, etc.) from his/her home if s/he is the only borrower on the original loan documents but an occupant, who is not on the loan, is still living in the property as a primary residence?

If the borrower was occupying the property as his or her principal residence immediately prior to his or her displacement, intends to occupy the property as his or her principal residence upon his or her return and the current occupant is not a tenant, the mortgage loan is eligible for consideration under HAMP. The servicer must confirm the borrower's occupancy representations as set forth in Supplemental Directive 09-07.

**Q78. [NEW]** Is extinguishment of a second lien required under HAMP?

No. Extinguishment of second lien instruments is not a requirement of HAMP. Servicers should refer to guidance on the Second Lien Modification Program provided in Supplemental Directive 09-05 or by the applicable GSE.

**Q79. [NEW]** Please clarify the definition of non-borrower household income. Who is a non-borrower?

A non-borrower is someone who is not on the original note (and may or may not be on the original security instrument), but whose income has been relied upon to support the mortgage payment. Non-borrower household income that may be considered for HAMP qualification must come from someone who resides in the residence. Examples include a non-borrower spouse, parent, child or a non-relative, but in each case, a person who shares in the occupancy of the home and provides some support for the household expenses.

**Q80.** **NEW** **What information must a borrower provide to document unemployment benefit income (UI)?  What resources exist to allow a servicer to verify this unemployment insurance benefit information?**

Borrowers must document the amount, frequency and duration of the unemployment benefits.  This information is typically obtained through official UI benefit documentation (the "Monetary Determination Letter").  Note that the Monetary Determination Letter does not include exceptional state benefit extensions and federally funded benefit extensions; therefore the total duration of the borrower's UI eligibility is not reflected in the "Maximum Benefit Amount" field of the Monetary Determination Letter.

To determine the total length of time an unemployed borrower may continue receiving payments – including federal and state-specific extensions – the servicer may use the Department of Labor UI benefit tool which is available at http://www.ows.doleta.gov/unemploy/ben_entitle.asp.  If this tool is used, a screen shot of the output should be included with the loan file.  Information about the length of benefit eligibility for workers qualifying for Trade Adjustment Assistance can also be found at the above Web site.

**Q81.** **NEW** **Is a borrower who is unemployed with six months of unemployment benefits remaining and the ability to file for an extension extending benefits beyond the required nine months eligible for HAMP?**

If the servicer makes a reasonable determination that the borrower is eligible to file for an extension for the unemployment benefits, and the extension would extend to or beyond nine months from the servicer's initial evaluation of the borrower for HAMP eligibility, such unemployment income is eligible to be included when qualifying the borrower for HAMP.  The borrower must also meet all other HAMP eligibility criteria.

**Q82.** **NEW** **How should the borrower's "pay for performance" incentive be treated for tax reporting purposes?**

The IRS has ruled that the borrower's "pay for performance" principal balance reduction payment will be excluded from gross income for tax reporting purposes.

**Q83.** **NEW** **Is it permissible for a servicer to require a delinquent borrower to make a "good faith" or contribution payment pending the processing of the trial period plan before the plan starts?**

No, servicers may not require the borrower to make a "good faith" or contribution payment.

**Q84.** **NEW** **May a servicer accept information provided on behalf of borrowers by trusted advisors such as HUD-approved housing counselors?**

Yes.  Servicers should accept borrower information delivered by an authorized trusted advisor on behalf of a borrower and may use that information to determine HAMP eligibility.  In such cases, the servicer must comply with applicable privacy and other laws and, when necessary, obtain evidence of the borrower's consent to the servicer's sharing of the borrower's private financial information with the trusted advisor.

Servicers may pledge any portion of the upfront servicer incentive that is earned in conjunction with a completed HAMP modification to compensate trusted advisors acting on behalf of a borrower, provided that there is no fee charged to the borrower.

**Q85.** [NEW] **If there are changes in a borrower's tax and insurance premium payments during the trial period (but after a verified approval), must the servicer re-evaluate the borrower for HAMP eligibility and obtain a new NPV result?**

No, the servicer is not required to re-evaluate the borrower for HAMP eligibility or obtain a new NPV result after the eligibility determination based on verified income documentation. However, the servicer must provide written notice to the borrower – in addition to any escrow notification required by RESPA – which explains the impact of the new escrow payment on the trial period plan.

## N. Standard Modification Waterfall Questions

**Q86. Please clarify the servicer's obligation as it relates to the HOPE for Homeowners (H4H) requirement.**

While the servicer is gathering information to determine if a borrower meets the minimum eligibility criteria for HAMP, it should also be assessing whether the borrower may be eligible to refinance through an FHA H4H loan. This assessment would involve asking the following set of questions:

- Will the loan amount exceed $550,440?
- Has the borrower made less than 6 full payments during the life of the first lien loan?
- Does the borrower have an ownership interest in other residential real estate (including 2nd homes/rental properties)?
- Was the mortgage to be refinanced originated after January 1, 2008?
- Does the property contain more than 1 unit?

If the answer to all of these questions is "NO", the borrower may be eligible for H4H. In this case, the servicer should counsel the borrower to seek a refinance with an H4H lender. If the servicer's origination division does not participate in the H4H program, a listing of participating lenders can be found at the following link:

http://portal.hud.gov/portal/page?_pageid=73,7605762&_dad=portal&_schema=PORTAL

If the servicer knows that the related owner or third party investor does not permit principal forgiveness, which is required under H4H, no servicer action is required with respect to that loan. However, the servicer may not refuse to consider a borrower for HAMP or refuse to initiate a trial period plan for an otherwise qualified borrower subject to that borrower applying for and being denied a loan under H4H.

Servicers should demonstrate compliance with this requirement by documenting the date of the referral. Servicers are not – under any circumstances – required to take a loan application from the borrower.

**Q87. REVISED If a pooling and servicing agreement or other investor servicing agreement ("PSA") or applicable law restricts or prohibits a modification step in the standard modification waterfall and the servicer partially performs it or skips it, does the modification still qualify for HAMP?**

Yes. Servicers should maintain evidence in the loan file documenting the nature of any deviation from taking any sequential modification step in the standard modification waterfall. The evidence should demonstrate that the applicable PSA or applicable law restricted or prohibited the servicer from fully performing or taking the modification step. If a servicer was restricted or prohibited from fully performing or taking the modification step, the documentation should show that it made reasonable efforts to seek a waiver from the applicable investor and whether the requested waiver was approved or denied.

The requirement set forth in Supplemental Directive 09-01 to seek prior approval from Fannie Mae, in its capacity as program administrator, for deviating from the standard modification waterfall has been eliminated.

**Q88. May a servicer extend the term before reducing the interest rate if the servicer believes the outcome is better for the borrower?**

Servicers must follow the waterfall steps sequentially as outlined by Supplemental Directive 09-01. The interest rate must be fully reduced to 2 percent prior to any term extension. However, servicers are not precluded under HAMP from agreeing to a modification where additional principal forbearance is substituted for extending the term as needed to achieve the target monthly mortgage payment ratio of 31 percent, as long as the modification otherwise complies with HAMP requirements. In this case, borrower, servicer and investor incentive / reimbursement payments will be paid on modification terms that reflect the target monthly mortgage payment ratio and standard modification terms.

**Q89. Can servicers agree to a rate below 2 percent or fix the reduced rate for the life of the loan?**

Yes. Subject to investor guidelines or applicable law, servicers are not precluded under HAMP from agreeing to a modification where the interest rate is reduced to less than 2 percent or does not step up after five years. However, borrower, servicer and investor incentive/reimbursement payments for these modifications will be paid based on modification terms that reflect the target monthly mortgage payment ratio and standard modification terms.

**Q90. NEW If a PSA prohibits term extension (but not extension of the amortization schedule), may a servicer modify the loan under HAMP by reducing the interest rate and extending the amortization schedule as necessary to achieve the target monthly mortgage payment ratio and edit the Home Affordable Modification Agreement accordingly to reflect the extended amortization schedule?**

Yes. As provided in Supplemental Directive 09-01, if a servicer is prohibited under a PSA from extending the term (but is not prohibited from extending the amortization schedule), the servicer may extend the amortization schedule up to 480 months to achieve the target monthly mortgage payment ratio. If, in this case, the amortization schedule would terminate after the loan's maturity date, then the borrower must pay the remaining balance on the maturity date in the form of a balloon payment. Servicers are reminded that they are required to amend the Home Affordable

Modification Agreement and Trial Period Plan as necessary to comply with applicable federal, state and local law, which would include any required disclosures of a balloon payment. In addition, in this circumstance, a servicer should amend the payment schedule in Section 3C of the Modification Agreement to reflect a final balloon payment due at maturity of the loan. Finally, the servicer must document the PSA prohibition on term extension as set forth in Q87 above.

**Q91. Where can the servicer obtain the Freddie Mac Primary Mortgage Market Survey rate?**

The Freddie Mac Primary Mortgage Market Survey rate (PMMS) is the conventional mortgage rate published in the Federal Reserve's H.15 bulletin. The weekly PMMS rate is available on the Freddie Mac home page at www.freddiemac.com.

**Q92. REVISED Is there a limit to the balloon payment on the end? Is there a maximum amount?**

Deleted. Refer to Q96.

**Q93. If subordination of a junior lien holder is required and that junior lien holder imposes a fee or cost reimbursement requirement, can the servicer pay the item and capitalize the amount?**

The servicer may not capitalize junior lien holder subordination fees. Servicers are not required, but may choose to pay those fees out of pocket and offset costs out of their incentive payments.

**Q94. If a loan was modified in the past and has a principal/interest forbearance tied to the previous modification, can that previous forbearance amount be capitalized? How should that balance be handled?**

Any prior forbearance amount may be capitalized to the extent that such forbearance is permitted under, and any required disclosures comply with, all applicable laws, rules and regulations.

**Q95. If the servicer cannot reduce the borrower's payment to achieve the 31 percent target monthly mortgage payment ratio, can the servicer still modify the loan under HAMP (for example, to a 35 percent monthly mortgage payment ratio) and receive HAMP incentives?**

If the servicer cannot reduce the borrower's monthly mortgage payment ratio to the target of 31 percent, the modification will not satisfy the HAMP requirements and no incentives will be payable in connection with the modification. However, the servicer should consider all other loss mitigation options that may be available based on investor guidelines and contractual agreements.

**Q96. REVISED Are there limits to how much forbearance is required in the standard modification waterfall?**

If the result of the NPV test is "positive", servicers are not required to forbear more than the greater of (i) 30 percent of the unpaid principal balance of the mortgage loan (after any capitalization under Step 1 of the standard modification waterfall) or (ii) an amount resulting in a modified interest-bearing balance that would create a current mark-to-market loan-to-value ratio equal to 100

percent. If the borrower's monthly mortgage payment cannot be reduced to the target monthly mortgage payment ratio of 31 percent unless the servicer forbears more than the amounts described above, the servicer may consider the borrower ineligible for a HAMP modification. However, servicers are permitted, at their discretion, to forbear principal in excess of the amounts described above in order to achieve the target monthly mortgage payment ratio of 31 percent.

If the result of the NPV test is "negative", the servicer may not forbear more than an amount resulting in a modified interest-bearing balance that would create a current mark-to-market loan-to-value ratio equal to 100 percent. If the borrower's monthly mortgage payment cannot be reduced to the target monthly mortgage payment ratio of 31 percent unless the servicer forbears more than the amount described above, the servicer must consider the borrower ineligible for a HAMP modification.

### Q97. Is a borrower with a mortgage loan that has a current remaining term (prior to modification) that is greater than 480 months eligible for a HAMP modification?

Yes. The fact that the loan's current remaining term is greater than 480 months does not disqualify the borrower from HAMP eligibility. If the borrower is otherwise eligible under HAMP and reduction of the borrower's current interest rate to two percent would not be sufficient to reach the target monthly mortgage payment ratio of 31 percent, the servicer should skip the term extension step of the standard modification waterfall and proceed to the principal forbearance step of the waterfall to attempt to achieve the target monthly mortgage payment ratio of 31 percent. The servicer should enter the remaining term in the NPV input field labeled "Amortization Term after Modification" so that the number in this field and the "Remaining Term" NPV input field are identical.

## O. Incentives and Payments

### Q98. What does it mean to be in good standing?

A borrower is considered to be in good standing under the program if they are not delinquent by the equivalent of three full monthly payments at the end of the month in which the last of the three delinquent payments was due.

### Q99. If there is a 30-60 day delinquency during the year, will the incentive payments still accrue?

Borrower "pay for success" principal balance reduction payments will accrue as long as the borrower is current and makes his or her monthly payment on time (the payment is made by the last day of the month in which the payment is due). For example, if the borrower is current and makes 10 out of 12 payments on time, he or she will be credited for 10/12 of the annual incentive payment as long as the loan is in good standing at the time the annual incentive is paid. A borrower whose loan is delinquent on a rolling 30- or 60-day basis will not accrue annual incentive payments.

Servicer "pay for success" fees will be paid annually as long as the loan is in good standing at the time the annual incentive is paid.

### Q100. How does a borrower lose good standing?

If a borrower misses three payments following execution of a Home Affordable Modification Agreement (three monthly payments are due and unpaid on the last day of the third month), the

loan is no longer considered to be in "good standing". A loan that is not in good standing permanently loses eligibility to receive further incentives and reimbursements under the program. Undisbursed payments to borrowers, servicers and investors, even if accrued, will not be made. Once lost, good standing cannot be restored and eligibility for incentives and interest reimbursements cannot be reclaimed, even if the borrower fully cures the delinquency.

**Q101.** [REVISED] Is a borrower that has failed a HAMP modification eligible for another HAMP offer?

No. A borrower that fails a HAMP modification is not eligible for another HAMP offer. However, the servicer must work with the borrower to attempt to cure the delinquency. If a cure is not possible, the servicer must consider the borrower for any other home retention loss mitigation options that may be available. If those options are unsuccessful, the servicer must consider the borrower for a short sale or deed-in-lieu when applicable.

**Q102.** In what form will the incentive payments be paid -- physical checks or wires? Will they be by individual loan or consolidated? If consolidated, will Fannie Mae provide loan-level accounting for the incentives? Are there any differences in payment method between Fannie Mae, Freddie Mac and non-GSE? Finally, for investor payments, can you clarify when the investor incentive will be sent to the servicer? For securitization Trusts, is Treasury going to issue any guidance on how those funds are to be passed through to security holders?

Incentive payments for all modifications, whether held by Fannie Mae, Freddie Mac or non-GSE investors, will be paid via wire transfer in a consolidated fashion. Fannie Mae will provide loan-level accounting for the incentives. The investor monthly cost share reduction payment is paid monthly to servicers starting in the first month after the official modification. It is the servicers' obligation to remit the investor monthly cost share reduction payments to the appropriate investors/security holders. Treasury is not providing guidance on how those funds are to be passed through to security holders of securitization trusts. However, Freddie Mac, Treasury's Compliance Agent, will monitor to ensure that cost share reduction payments are remitted to security holders and that pay for success payments are applied to borrower accounts in accordance with the program's guidelines.

**Q103.** If a borrower receives a modification under HAMP and pays the loan off early, would the borrower subsequently receive his or her accrued incentive for the months in which he or she performed (e.g., the borrower pays off the mortgage before the anniversary date of the beginning of the trial period, but had accrued several months of incentive)? Would a servicer receive any incentive payment?

Incentives, including accrued but unearned incentives, will not be paid to any party after the loan is paid in full.

**Q104.    For GSE loans, do the respective announcements, bulletins, and Guide chapters published by either Fannie Mae or Freddie Mac constitute part of the "guidelines issued by the Secretary of the Treasury or his designee under the Emergency Economic Stabilization Act of 2008" for purposes of determining the scope and availability of the Servicer Safe Harbor for Mortgage Modifications as set forth in section 201 of the Helping Families Save Their Homes Act of 2009?**

Yes. In order to enjoy the protections afforded by the Servicer Safe Harbor, servicers of loans owned, guaranteed, or securitized by Fannie Mae ("Fannie Mae Mortgages") must service Fannie Mae Mortgages in accordance with Fannie Mae Announcement 09-05R and any related announcement published by Fannie Mae governing the implementation of HAMP with respect to Fannie Mae Mortgages.    In order to enjoy the protections afforded by the Servicer Safe Harbor, servicers of loans owned, guaranteed, or securitized by Freddie Mac ("Freddie Mac Mortgages") must service Freddie Mac Mortgages in accordance with the Freddie Mac Seller/Servicer Guide, Chapter C65 and any related Bulletins published by Freddie Mac governing the implementation of HAMP with respect to Freddie Mac Mortgages.

**Q105.    [NEW] Is the investor payment reduction cost share compensation retroactive to the trial period start date, or does it accrue from modification effective date forward and pay annually on that anniversary date?**

The investor payment reduction cost share compensation accrues monthly from the effective date of the official modification, not from the start of the trial period. The compensation is paid monthly beginning the month following month of the effective date of the official modification.    Such compensation shall accrue monthly as the borrower makes each payment so long as the loan is in good standing as defined in Supplemental Directive 09-01. This compensation will be provided for up to five years or until the loan is paid off, whichever is earlier.

**Q106.    [NEW] If a borrower's "pay for performance" incentive is due to be paid when the borrower is delinquent, should the servicer apply the payment as a principal curtailment?**

In the event the borrower is delinquent, but still in good standing, the borrower's incentive should continue to be applied as a curtailment to the interest-bearing UPB.

## P. Government Monitoring Data

**Q107.    What information are servicers required to collect?**

Servicers must request information regarding the race, sex, and ethnicity (Government Monitoring Data) of any borrower (including any co-borrower) who seeks a modification under HAMP.

**Q108.    Why does the federal government need the Government Monitoring Data?**

In the federal Fair Housing Act, Congress prohibited discrimination in the sale and financing of housing and charged HUD with administering the Fair Housing Act.    HUD requests the data in order to ensure that HAMP modifications are conducted in compliance with the Fair Housing Act.    Under the Fair Housing Act, neither note holders nor their servicers may discriminate against any person

seeking a modification under HAMP on the basis of race, national origin, sex, or any other prohibited basis.

**Q109.**  **REVISED** When are servicers required to begin collecting and reporting Government Monitoring Data?

Servicers should refer to the guidance provided in Supplemental Directive 09-06 with respect to the collection and reporting of Government Monitoring Data.

**Q110.**  At what point in the HAMP process is the requirement to request Government Monitoring Data triggered, and how should servicers request Government Monitoring Data from the borrower?

Government Monitoring Data must be requested when servicers receive a modification request under HAMP from the borrower. A request will be considered to have been received once the borrower has furnished the servicer with either a Hardship Affidavit (Rev. April 2009 or later) or an MHA Request for Modification and Affidavit form ("RMA"). Servicers should request the Government Monitoring Data as follows:

(a)  If the borrower completes the Hardship Affidavit or RMA in a face-to-face setting by mail or over the Internet, the borrower will be able to read the disclosure contained just beneath the Information for Government Monitoring Purposes section heading, determine whether he or she wishes to furnish the Government Monitoring Data, and complete the remainder of the Information for Government Monitoring Purposes section accordingly. "Complete" means either furnish the requested Government Monitoring Data or check the box which states "I do not wish to furnish this information".

(b)  If the servicer is gathering the information necessary to complete the Government Monitoring Data from the borrower in a face-to-face interview or over the phone, the servicer should first read to the borrower the disclosure contained just beneath the Information for Government Monitoring Purposes section heading. This will inform the borrower that the federal government requests this monitoring information in order to monitor compliance with federal statutes that prohibit lenders from discriminating against borrowers based on the borrower characteristics collected in the Government Monitoring Data. It will also inform the borrower that if he or she chooses not to provide the Government Monitoring Data, then, where the Hardship Affidavit or RMA is taken in person, the servicer is required to note the data on the basis of visual observation or surname. After reading the disclosure to the borrower, the servicer should ask the borrower whether he or she desires to furnish the information. If the borrower elects to furnish the Government Monitoring Data, the servicer should read the race, ethnicity and sex categories and options from the Information for Government Monitoring Purposes section, ask the borrower which boxes he or she would like checked, and then check the boxes as directed by the borrower. If the borrower declines to furnish the information, see Q112 below.

While servicers must ask and encourage each borrower who completes a Hardship Affidavit or RMA to furnish the Government Monitoring Data, servicers may not require the borrower to furnish the Government Monitoring Data.

**Q111.    What response should a servicer provide when asked by a borrower why the Government Monitoring Data is requested?**

Servicers should ensure that their servicing staff and managers understand the importance of requesting that HAMP participants provide the Government Monitoring Data.    The federal government requests this monitoring information in order to monitor compliance with federal statutes that prohibit lenders from discriminating against borrowers on the basis of race, ethnicity and sex. In instances where borrowers decline to provide the information, servicing staff should be provided with training and job aids, e.g., desk references, scripts and, where feasible, system prompts, to supply this information as described below in Q113.

Additionally, servicers should ensure that their internal quality control plans include procedures for monitoring compliance with these requirements regarding the request for Government Monitoring Data.

**Q112.    What if the borrower declines to provide the Government Monitoring Data?**

If a borrower declines or fails to furnish all or part of the Government Monitoring Data, either the servicer or the borrower should note that fact on the Hardship Affidavit or RMA.

(a)    If the borrower completes the Hardship Affidavit or RMA in a face-to-face setting and chooses not to furnish the Government Monitoring Data, he or she should check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA.  If the borrower chooses not to check the box, the servicer should note this fact on the form.  See Q113 below for further guidance on providing the Government Monitoring Data based on visual observation or surname.

(b)    If the borrower completes the Hardship Affidavit or RMA by mail, telephone or over the Internet, he or she should check or direct the servicer to check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA.  If the borrower chooses not to furnish the data or check the box, the servicer should indicate in the appropriate spaces within the Information for Government Monitoring Purposes section that the Hardship Affidavit or RMA was received by mail, telephone, or Internet and note the fact that the borrower chose not to furnish the Government Monitoring Data.

(c)    If the borrower furnishes the hardship information to the servicer as the servicer completes the Hardship Affidavit or RMA in either a face-to-face interview or over the phone, and the borrower elects not to furnish the Government Monitoring Data, the servicer should check the "I do not wish to furnish this information" box within the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA.  If the servicer is completing the Hardship Affidavit or RMA over the phone, note that fact in the appropriate space within the Information for Government Monitoring Purposes section.

**Q113.    If the borrower declines to provide the Government Monitoring Data, must servicers provide it?**

If a borrower declines to provide the Government Monitoring Data, servicers must attempt to provide it if the Hardship Affidavit or RMA is completed in a <u>face-to-face meeting</u> with the borrower

(either by the borrower or by the servicer based on information gathered from the borrower during the interview). In that situation, servicers should note the borrower's race, ethnicity and sex, but only to the extent possible on the basis of visual observation or surname.

If the borrower declines to provide the Government Monitoring Data or fails to provide the information on a Hardship Affidavit or RMA taken by <u>mail, telephone or over the Internet,</u> the data need not be provided.

**Q114.    If the borrower declines to provide Government Monitoring Data in connection with a request for modification but a servicer has race, ethnicity and sex data in its system that was obtained at the time of loan origination, should the servicer complete the Hardship Affidavit or RMA using the original race, ethnicity and sex data?**

If the servicer has reasonable access to Government Monitoring Data supplied by the borrower at origination and the borrower and co-borrower remain the same, the servicer is required to provide that information.

**Q115.    If servicers have race, ethnicity and sex data in their systems obtained at the time of loan origination, should the original data be replaced with the Government Monitoring Data from the Hardship Affidavit or RMA?  Should servicers amend any HMDA reporting for the year in which the loan origination occurred?**

This is a question that should be directed to the servicers' counsel or compliance expert.

**Q116.    If a servicer has not asked for Government Monitoring Data in connection with a modification request it has already received, does the servicer need to contact the borrower to request the Government Monitoring Data now?**

Yes.  The servicer should contact the borrower and ask him or her to furnish the Government Monitoring Data prior to completing the modification if the monitoring information is required and the servicer failed to request it.  There are several ways the servicer can make the request.  They include:

(a)    Mailing to the borrower either (i) a blank Hardship Affidavit or RMA containing the Information for Government Monitoring Purposes section, or (ii) an exact copy of the Information for Government Monitoring section of the Hardship Affidavit or RMA.  The servicer should request that the borrower read and complete the Information for Government Monitoring Information Purposes section and mail the form back to the servicer.  The servicer should inform the borrower that while he or she is encouraged to complete the form, he or she is not required to complete it.  If the servicer mails the entire Hardship Affidavit or RMA, the servicer is encouraged to strike through all sections of the Hardship Affidavit or RMA (including the signature lines) except for the Information for Government Monitoring Purposes section in order to avoid confusion and rework on the part of the borrower.  Either mailing should include a cover letter describing the intended use and importance of the Government Monitoring Data and encouraging the borrower to provide it.  Servicers should also either provide a self addressed postage paid envelope for return of the form, or should provide a toll free number and/or internet address that the borrower may use to supply the data.

(b)     Telephone the borrower and request the Government Monitoring Data by following the guidance furnished in Q110 above. As indicated in Q110, in requesting the Government Monitoring Data by phone, the servicer must use the exact text from the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA to request and record responses from the borrower and any co-borrower. The servicer should also develop a script for use by their servicing staff to encourage borrowers to voluntarily furnish the Government Monitoring Data request.

(c)     Send by e-mail or make available to the borrower through a website, access to a digital online form or a .pdf copy of either (i) the Hardship Affidavit or RMA containing the Information for Government Monitoring Purposes section, or (ii) the Information for Government Monitoring Purposes section of the Hardship Affidavit or RMA only. The format and text of any electronic or digital version of the Information for Government Monitoring Purposes section must be identical to that found in the Hardship Affidavit or RMA. Be sure to request that the borrower read and complete the Information for Government Monitoring Purposes section and, as appropriate, either submit to the servicer electronically or print and mail the completed form back to the servicer.

The servicer's email or website should explain the intended use and importance of the Government Monitoring Data and encourage the borrower to provide it. It should also inform the borrower that while he or she is encouraged to complete the form, he or she is not required to complete it. If the servicer makes available the entire Hardship Affidavit or RMA, the servicer is encouraged to emphasize to the borrower that only the Information for Government Monitoring Purposes section should be completed. In the event the servicer makes an electronic version of the Hardship Affidavit, the RMA or the Information for Government Monitoring Purposes section available to the borrower, the servicer must comply with all applicable privacy, data security, disclosure and other laws and regulations.

**Q117.     If the prior version of the Hardship Affidavit (which did not contain the Information for Government Monitoring Purposes section) has been completed and signed by the borrower, does a servicer need to ask the borrower to complete the current version of the Hardship Affidavit (Rev. April 2009 or later) or the RMA, in whole or in part?**

Yes. Prior to the completion of the modification, the servicer should ask the borrower to complete only the Information for Government Monitoring Purposes section of the current version of the Hardship Affidavit or the RMA. See Q116 above for three ways in which a servicer may make the request. However, please note that when asking the borrower to complete the form, the servicer should clearly instruct the borrower not to complete or sign the remaining portions of the current version of the Hardship Affidavit or the RMA.

**Q118.     Will Freddie Mac, in its capacity as Compliance Agent for the Treasury, monitor servicer compliance with collection of Government Monitoring Data?**

Yes. Freddie Mac is currently developing its compliance and monitoring protocol which will include monitoring of servicers with respect to requests for and the collection and reporting of Government Monitoring Data.

**Q119.    Does a servicer have the legal authority to request Government Monitoring Data from borrowers?**

The Federal Reserve Board regulations interpreting ECOA permit the collection of information on the race, ethnicity and sex of borrowers when the information is "required by a[n] . . . agreement . . . entered into with  . . . an enforcement agency...to monitor or enforce compliance with [ECOA], this regulation, or other federal or state statutes or regulations." 12 C.F.R. 202.5(a)(2).  HUD has requested the collection of the data pursuant to its obligation to enforce the Fair Housing Act (see a copy of the HUD letter here).

On behalf of HUD, Treasury has directed Fannie Mae, as a financial agent of the United States, to enter into agreements to require servicers that offer modifications under HAMP to request Government Monitoring Data from borrowers (see a copy of the Treasury letter here).

Fannie Mae has incorporated Supplemental Directive 09-02, which explains these data collection requirements, into the Servicer Participation Agreements by reference.  As a result, Supplemental Directive 09-02: (a) constitutes an agreement entered into between Fannie Mae, on behalf of HUD, and servicers participating in HAMP; and (b) is an agreement entered into by participating servicers with an enforcement agency (i.e., HUD) to permit the enforcement agency to monitor or enforce compliance with federal law, within the meaning of 12 C.F.R. 202.5(a)(2).

If a servicer has any questions regarding its legal obligations, the servicer should consult its own counsel.